## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

*MYRON COWHER*

Plaintiff                          CIVIL ACTION NO:_3:16-CV-2259-MEM-KM

v.

*Correct Care Solutions, LLC;*

*Et al*

Defendants

## PLAINTIFF COWHER'S RESPONSE TO CORRECT CARE DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND COWHER'S STATEMENT OF ADDITIONAL UNDISUPUTED FACTS

I.     **Response to Correct Care Facts:**

1-8.   Admitted.

9.     Admitted.  By way of further response, on May 6, 2016, Cowher was scheduled to see Dr. Rajjoub on May 31, 2016.  *See,* Correct Care Exhibit 'A' at 65.

10.    Admitted.  By way of further response, a provider note at the comments section says "Urgent." (emphasis in original).

11-20. Admitted.

21-22. Admitted.

1

23-30.  Admitted.

31-32.  Admitted. By way of further response, it is undisputed that Correct Care refused to facilitate the surgery that Cowher was scheduled for on January 4, 2017. It is also undisputed that nobody told Cowher that he was actually scheduled for surgery on that date.

33-99.  Admitted.

## II.     Cowher's Statement of Undisputed Facts:

1. Dr. Courtney Rogers saw Cowher on at least two occasions. *See,* Cowher Ex. 'A' at Exhibits Rogers 2 and 3.

2. Dr. Rogers testified that even if an inmate arrives with a pre-existing scheduled surgery, and provides medical record such as MRI reports, Correct Care Solutions must still essentially recreate the inmate's entire medical chart by securing all records from all outside providers. *See,* Ex. 'A' at 7-8, 15.

3. Dr. Rogers saw Cowher on at least two occasions (2/8/17 and 3/1/17) and on both occasions placed an order for Cowher's medical records from outside providers to be obtained. *See,* Exhibit 'A' at Exhibits Rogers 2 and 3.

4. During his first consultation with Cowher, Dr. Rogers reviewed "paperwork" that showed that Cowher had significant cervical issues. *See,* Cowher Ex. 'A' at Exhibits Rogers 2.

5. It is not Correct Care's responsibility to order medical records, but rather that task must be handled by the medical records department of the Department of Corrections upon a request from Correct Care personnel. *See,* Cowher Ex. 'A' at 24-26.

6. Correct Care personnel have no control over whether the DOC medical records department actually obtains or even requests medical records that are sought by Correct Care personnel. *Id.*

7. Dr. Rogers does not remember if he made any specific follow up communication to the DOC medical records department about getting Cowher's records, despite twice having written orders for them to be obtained.

8. Cowher never received surgery while in state custody because Correct Care never received all of his medical records from outside providers. *See*, Ex. 'A' at 24.

Respectfully submitted,

**MOSSER LEGAL, PLLC**
**BY:**

_____/s/ TMM_____

Todd M. Mosser

Counsel for Plaintiff

Attorney ID: 87534

211 North 13th St., Suite 801

Philadelphia PA 19107

215-567-1220

todd@mosserlegal.com

**4/4/19**

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served on all parties via the ECF system.

Respectfully submitted,

**MOSSER LEGAL, PLLC**

**BY:**

_____**/s/ TMM**_____

Todd M. Mosser

Counsel for Plaintiff

Attorney ID: 87534

211 North 13th St., Suite 801

Philadelphia PA 19107

215-567-1220

todd@mosserlegal.com

**4/4/19**

**EXHIBIT 'A'**



# Compressed Transcript of the Testimony of
# COURTNEY PATRICK RODGERS, D.O., 1/25/19

**Case:** Cowher v. Lowe, et al.

ORIGINAL

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

**Cowher v. Lowe, et al.**　　　　　**COURTNEY PATRICK RODGERS, D.O., 1/25/19**

---

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

MYRON COWHER,　　　　: CIVIL ACTION-LAW
　　Plaintiff,　:
　　　　　:
　　vs.　　　:
　　　　　:
CRAIG A. LOWE, et al.,　:
　　Defendants.　: NO. 3:16-CV-02259

- - -

Oral deposition of COURTNEY PATRICK RODGERS,

D.O., taken at SCI Mahanoy, 301 Morea Road,

Frackville, Pennsylvania 17932, on Friday,

January 25, 2019, beginning at 10:24 a.m. before Nancy

J. Taguinot, RPR, CCR(NJ), Registered Professional

Reporter and Notary Public in and for the Commonwealth

of Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

---

## Page 2

1　A P P E A R A N C E S :
2　MOSSER LEGAL, PLLC
　　BY: TODD N. MOSSER, ESQUIRE
3　211 N. 13th Street
　　Suite 801
4　Philadelphia, Pennsylvania 19107
　　TEL: (215) 557-1220
5　E-MAIL: todd@mosserlegal.com
6　-- Representing the Plaintiff
7　MARSHALL, DENNEHEY, WARNER,
　　COLEMAN & GOGGIN
8　BY: JOHN R. NINOSKY, ESQUIRE
　　100 Corporate Center Drive
9　Suite 201
　　Camp Hill, Pennsylvania 17011
10　TEL: (717) 651-3709
　　E-MAIL: jrninosky@mdwcg.com
11
　　-- Representing the Defendants Pike County; Craig
12　Lowe, Warden, Pike County Correctional
　　Facility; Jonathan J. Romance, Assistant
13　Warden; Robert E. McLaughlin, Assistant
　　Warden; Primecare Medical, Inc.; Kendle
14　Jeminola, RN, HSA; Denise Jeminola, RN, CCHP;
　　Derek Hughes, MBA, CCHP; Thomas J. Weber,
15　Esq., CEO; Todd W. Haskins, RN, BSN;
　　Pennsylvania Department of Corrections;
16　Theresa DelBaso, Superintendent, SCI Mahanoy;
　　and Laurel Hardy, SCI Camp Hill
17
18　WEBER, GALLAGHER, SIMPSON, STAPLETON,
　　FIRES & NEWBY, LLP
19　BY: CAITLIN GOODRICH, ESQUIRE
　　2000 Market Street, Suite 1300
20　Philadelphia, Pennsylvania 19103
　　TEL: (267) 295-3367
21　E-MAIL: cgoodrich@wglaw.com
22　-- Representing the Defendant Correct Care
　　Solutions, LLC and the witness
23
24

---

## Page 3

1　　　　　I N D E X
2　　　　　* * *
3　WITNESS: COURTNEY PATRICK RODGERS, D.O.
4　QUESTIONED BY:　　　　　PAGE
5　　Mr. Mosser　　　　　4, 29
　　Ms. Goodrich　　　　24
6
7　　　　　E X H I B I T S
8　　　　　* * *
9　NUMBER　　DESCRIPTION　　　MARKED
10　Rodgers-1　Curriculum Vitae　　　5
11　Rodgers-2　Page from medical records,　6
　　　　　2/9/17
12
　　Rodgers-3　Physician's Order Form,　12
13　　　　01/31/19
14　Rodgers-4　Record from Upstate Radiology,　17
　　　　　PC, Open MRI of Williamsport
15
16
17
18
19
20
21
22
23
24

---

## Page 4

1　　　　　* * *
2　　　　(It is hereby stipulated and agreed by and
3　among counsel for the respective parties that
4　sealing, certification, and filing are waived and
5　that all objections, except as to the form of the
6　question, are reserved until the time of trial.)
7　　　　　* * *
8　　　COURTNEY PATRICK RODGERS, D.O.,
9　　　having been first duly sworn, was
10　　　examined and testified as follows:
11　　　　　* * *
12　　　　　EXAMINATION
13　　　　　* * *
14　BY MR. MOSSER:
15　　Q.　Good morning, Dr. Rodgers.
16　　A.　Good morning.
17　　Q.　My name is Todd Mosser.  I represent Myron
18　Cowher.  Have you ever had your deposition taken
19　before?
20　　A.　I have not.
21　　Q.　Okay.  A couple of quick ground rules.  If
22　I ask you a question you don't understand, let me know
23　and I'll try to rephrase it.  All of your answers have
24　to be verbal because this is on the record.  So nods

---

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**Cowher v. Lowe, et al.**                                    **COURTNEY PATRICK RODGERS, D.O., 1/25/19**

Page 5

1   of the head --
2       A.   Right.
3       Q.   And the other thing is yeahs and uh-huhs
4   don't work either.  Okay?
5       A.   Right.
6       Q.   Do you understand?
7       A.   I do.
8       Q.   Good.  So the first thing is I have what
9   is a CV here.  The top of it says Courtney Patrick
10  Rodgers.  Is that your CV?
11      A.   Yes, it is.
12      Q.   Okay.  So we'll have this attached as
13  Exhibit 1.
14                    * * *
15          (Whereupon, Exhibit Rodgers-1 was marked
16      for identification.)
17                    * * *
18  BY MR. MOSSER:
19      Q.   What's your current position at Correct
20  Care Solutions?
21      A.   I'm a site medical director at SCI
22  Mahanoy.
23      Q.   Okay.  Was that your position in January
24  of '17?

Page 6

1       A.   Yes, it was.
2       Q.   Do you remember Myron Cowher?
3       A.   I do not recall him specifically.  I do
4   recognize the picture and I do recognize the name.
5       Q.   Okay.  I just want to go over a couple of
6   what looks to be progress notes with you.  The first
7   thing I want to show you we'll mark as Exhibit 2.
8                    * * *
9           (Whereupon, Exhibit Rodgers-2 was marked
10      for identification.)
11                    * * *
12          MR. MOSSER: You guys have it as the first
13      page.
14  BY MR. MOSSER:
15      Q.   You see in the middle of the page there
16  there's a stamp that says Courtney Rodgers, D.O.?
17      A.   Yes, I do.
18      Q.   Is that your stamp?
19      A.   Yes, it is.
20      Q.   Okay.  Did you write the note that's above
21  that?
22      A.   Yes, I did.
23      Q.   Okay.  And to the left it's dated February
24  8th, 2017.  Do you see that?

Page 7

1       A.   Yes, I do.
2       Q.   Okay.  Now the top line says, "Reviewed
3   prior paperwork and PT.  Significant cervical issues
4   included herniated discs."
5           Do you remember how you knew that from Mr.
6   Cowher?
7       A.   Can you expand on that question?
8       Q.   Sure.  How did you know he had herniated
9   cervical discs?
10      A.   Based on this, it looks like he had
11  brought paperwork with him that I looked at.
12      Q.   Okay.  Do you remember what paperwork that
13  was?
14      A.   No, I do not.
15      Q.   Okay.  Do you remember whether he brought
16  you any MRI paperwork?
17      A.   I do not.
18      Q.   Okay.  What kind of paperwork would cause
19  you to think he had herniated discs?
20      A.   Likely, it would have been MRI reports.
21      Q.   Okay.  Now, having had an MRI report, the
22  next thing it says, "Patient states intermittent
23  pain."  On the one, two, three, four, fifth line down
24  it says, "Discussed.  Will obtain these records and

Page 8

1   follow accordingly."
2           What other records did you need to have?
3       A.   That would have been any prior workup from
4   outside providers, including neurosurgery.  It said
5   that he had been seen by neurosurgery in county.  So
6   it would have been all of their records.
7       Q.   Okay.
8       A.   For their workup and evaluation.
9       Q.   Now, are those records something that's
10  typically in the possession of Correct Care by the
11  time a patient comes to see you?
12      A.   Ideally.
13      Q.   Okay.  When you say ideally, what does
14  that mean?
15      A.   It doesn't always happen that way.
16  Sometimes, once they get to our site, we have to put
17  in for those records.  We're a home-based site.  We're
18  a home institution, so when they come in initially
19  they come in to intake centers and then they go to
20  Camp Hill for assignment.
21      Q.   Right.
22      A.   And once they're finally assigned to a
23  home institution, that's when typically people will be
24  helped.

2 (Pages 5 to 8)

Cowher v. Lowe, et al.                                  COURTNEY PATRICK RODGERS, D.O., 1/25/19

Page 9

1    Q.    Okay. So am I hearing you correctly to
2   say sometimes those records get lost?
3          MS. GOODRICH: Objection to form. I don't
4   think that's what he said.
5          MR. MOSSER: Okay.
6          MS. GOODRICH: Would you agree with me
7   that what you're testifying is records begin to
8   get obtained once you get to home base?
9          THE WITNESS: Correct.
10  BY MR. MOSSER:
11   Q.    Okay. So where are those records obtained
12  from?
13   A.    Outside providers. I put in requests in
14  order for medical records to be obtained specific,
15  with contact information and medical records
16  through the DOC should obtain those records.
17   Q.    Okay. So -- but in this instance, you had
18  some medical records, correct?
19   A.    From --
20         MS. GOODRICH: Objection to form. Are you
21  saying that CCS had records, Myron Cowher had
22  records?
23  BY MR. MOSSER:
24   Q.    My question is, Dr. Rodgers wrote that he

Page 10

1   reviewed records, correct?
2    A.    From this note, it looks like there was
3   some type of prior paperwork that I reviewed.
4    Q.    And do you recall where that paperwork
5   came from?
6    A.    I do not.
7    Q.    Okay. Why -- having observed what you
8   observed here -- let me ask you this.
9          Does Correct Care Solutions have the
10  capacity to take an MRI?
11   A.    We have the capacity of obtaining a
12  consult for MRI.
13   Q.    So there's no MRI machine here?
14   A.    No.
15   Q.    Is there an x-ray machine here?
16   A.    No.
17   Q.    Okay. So how does an inmate get an MRI?
18   A.    It goes through the process of consult
19  approval. He will typically be seen by myself with
20  evaluation. If there's any significant findings, both
21  objectives and subjective, and I feel like an MRI is
22  warranted, I can submit it for a consult to my -- at
23  this time to my regional medical director, which would
24  be Dr. Wiener, it would be discussed, and he would

Page 11

1   approve or provide an alternate path.
2    Q.    Okay. And is there a reason why, in this
3   instance, you did not -- well, let me ask you this.
4   In this instance, did you suggest a consult for an
5   MRI?
6    A.    I do not believe I did.
7    Q.    Do you remember why?
8    A.    I would typically require all the prior
9   workup from neurosurgery, from any outside provider,
10  to warrant a medically necessary MRI.
11   Q.    After that MRI -- if, for instance, you
12  had recommended an MRI, would you have gotten the MRI
13  results?
14   A.    Yes. They do get faxed to us.
15   Q.    Okay.
16   A.    Sometimes not in a timely manner, but we
17  do get them faxed to us.
18   Q.    And do you make the decision on what to do
19  after you get those MRI results?
20   A.    I would with -- at the time, with
21  Dr. Wiener, we would discuss it and determine the plan
22  of action.
23   Q.    Okay. So let's go to the next page, which
24  is C 2.

Page 12

1                    * * *
2          (Whereupon, a discussion was held off the
3   record.)
4                    * * *
5          (Whereupon, Exhibit Rodgers-3 was marked
6   for identification.)
7                    * * *
8   BY MR. MOSSER:
9    Q.    All right. So I have shown you what's
10  Exhibit 3. You see at the top of the page there's a
11  stamp there that says Courtney Rodgers, D.O.?
12   A.    Yes.
13         MS. GOODRICH: Are we talking about the
14  top or the second one?
15         MR. MOSSER: The top one.
16         THE WITNESS: Let me just clarify. The
17  top one is actually for that top order. I have
18  to cosign for all of the midlevels. So that top
19  signature and stamp is actually for the top
20  order.
21         MS. GOODRICH: And he's referring to the
22  January 31st, 2017.
23         MR. MOSSER: Yes, I am.
24         THE WITNESS: Right.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

**Cowher v. Lowe, et al.**                    **COURTNEY PATRICK RODGERS, D.O., 1/25/19**

Page 13

1    BY MR. MOSSER:
2    Q.    On the right-hand side on the first line
3    it says "MRI of spine."  Do you see where it says
4    that?
5    A.    Yes.
6    Q.    Okay.  What does that mean?  Why was that
7    written there, MRI of spine?
8    A.    You would have to ask Nancy Palmigiano.  I
9    do not know why she wrote MRI of spine.
10   Q.    Is her name on this piece of paper
11   anywhere?
12   A.    It is.  It's right there in the middle.
13   Q.    There we go.  Okay.
14   A.    She was a P.A. at the time.
15   Q.    Okay.  And why are there two other names
16   on this besides yours, Nancy Palmigiano and Alice
17   Dudeck?
18   A.    So that top order was written by Nancy.
19   Q.    Uh-huh.
20   A.    And she stamped it and signed it.  And
21   then I have to cosign for the midlevels.  So that's
22   why my signature and stamp is there as well.
23   Q.    What do you mean when you say midlevel?
24   A.    Physician assistant or C.R.N.P., certified

Page 14

1    registered nurse practitioner.
2    Q.    Okay.
3    A.    And then Alice Dudeck, L.P.N., is the
4    nurse that took the order off.
5    Q.    Okay.  Took the order off?
6    A.    Of the paper chart.
7          MS. GOODRICH:  Why don't you explain what
8    "taking the order off" means.
9          THE WITNESS:  Acknowledged the order and
10   completed the task.
11   BY MR. MOSSER:
12   Q.    Okay.  And then February 8th, 2017 it
13   says, "Please obtain visit notes and recommendations
14   from previously seen neurosurgeon."
15         That's something that you wrote?
16   A.    That is my handwriting.  That is my order,
17   yes.
18   Q.    So it's fair to say that as of February
19   8th, 2017, you still had no records that you were
20   looking for?
21         MS. GOODRICH:  Objection to form.
22   BY MR. MOSSER:
23   Q.    The records that — well, what records —
24   what visit notes and recommendations from previously

Page 15

1    seen neurosurgeons were you looking for?
2    A.    All of them.
3    Q.    And at this point, it's fair to say, you
4    do not have them?
5    A.    It's fair to say that I did not have any
6    of the notes or visit recommendations from
7    neurosurgery at that time, yes.
8    Q.    Okay.  Okay.  Then on the bottom it says,
9    3/1/17, same thing, please obtain above records as
10   requested.
11   A.    Correct.
12   Q.    Now, if an inmate had given you records,
13   would you have looked at those in assessing what
14   needed to be done for the inmate?
15   A.    I would look at those, yes.
16   Q.    Okay.  And how would you know whether they
17   were complete or not?
18   A.    That — I wouldn't.  I would have to
19   request formal records from the prior provider.
20   Q.    Okay.  So an inmate could provide you with
21   a stack of records and am I hearing you say that,
22   despite that, you would need to request all the
23   records you could get from other providers?
24   A.    I would require prior notes and

Page 16

1    recommendations coming through the proper channels.
2    Q.    And what are the proper channels?
3    A.    That would be going through medical
4    records, putting in a request for a release of
5    information from prior providers for information being
6    sought.
7    Q.    Who's supposed to put in that request?
8    A.    That — I put in the order, as I did here,
9    and that goes to medical records through the DOC, and
10   the DOC medical records are tasked to obtain those
11   records.
12   Q.    How does that request go to — strike
13   that.
14         When you say medical records, is that a
15   department you're referring to?
16   A.    Yes, it is.
17   Q.    Okay.  How does this request go to medical
18   records?
19   A.    I cannot really tell you based on what the
20   nurses do, but I — they take that task off, as this
21   nurse did, Elizabeth Holden, and then they should be
22   informing medical records of the request.  The
23   procedure after that is — is beyond me.
24   Q.    Do you know whether or not a form or

**Cowher v. Lowe, et al.**                    **COURTNEY PATRICK RODGERS, D.O., 1/25/19**

Page 17

1   paperwork is generated when a nurse informs medical
2   records of the request you're making?
3       A.   At that time, no, I do not know of any
4   specific form that is generated.
5       Q.   Okay.
6       A.   The process is different now that we're a
7   full electronic medical record.
8       Q.   What do you mean when you say the process
9   is different now?
10      A.   I believe it goes through Sapphire, and so
11  there is a form for request of information.
12      Q.   And Sapphire is an electronic system?
13      A.   Correct.
14      Q.   Okay.  And in January of 2017, did you
15  have Sapphire?
16      A.   We had Sapphire, but it was only a partial
17  system at that time and it did not have that
18  capabilities; hence, why we had paper charts.
19      Q.   Okay.  We don't need to go through all of
20  these.  Let's go to what we'll mark as Exhibit 4,
21  which is the radiology report.
22              * * *
23          (Whereupon, Exhibit Rodgers-4 was marked
24          for identification.)

Page 18

1              * * *
2   BY MR. MOSSER:
3       Q.   Dr. Rodgers, I showed you what I've marked
4   as Exhibit 4.  This is titled Open MRI of
5   Williamsport.  Do you see where it says that?
6       A.   Yes, I do.
7       Q.   Okay.  Do you recall whether this is a
8   document that you saw or whether Mr. Cowher gave you
9   this document?
10      A.   I cannot specifically say this is the
11  document that I reviewed that day.
12      Q.   Okay.  Having reviewed this document --
13  well, why don't you take a moment and review where it
14  says findings.
15      A.   Okay.
16      Q.   Having reviewed those findings, as you sit
17  here today, do you think those findings warrant an
18  MRI?
19          MS. GOODRICH:  Objection to form.  He's
20      not a radiologist or a neurosurgeon, and I'm not
21      quite sure what -- you're asking if the findings
22      of the MRI report -- another MRI?
23          MR. MOSSER:  Yeah.
24          MS. GOODRICH:  I'm not quite sure.

Page 19

1          THE WITNESS:  Yeah, I don't understand the
2      question either.
3   BY MR. MOSSER:
4       Q.   Let's say you had gotten all the complete
5   records from the proper channels.
6       A.   Uh-huh.
7       Q.   And you had gotten this document.  Would
8   this document have caused you to do anything?
9       A.   I'm still not completely clear on the
10  question.
11      Q.   Assuming this document came through the
12  proper channels, would this have affected your
13  treatment of Mr. Cowher?
14      A.   This would be the type of information -- a
15  part of the type of information that we require to
16  move forward with counsel.
17      Q.   Okay.  What other information would you
18  have needed?
19      A.   The specialist outpatient services that
20  were provided, such as the office's exams from
21  neurology -- or neurosurgery, I should say.
22      Q.   And again, a consult that you would have
23  asked for is a consult for an MRI?
24      A.   Not with this.  This is an MRI that we

Page 20

1   would likely obtain for any type of surgery that would
2   be considered.  It would really be the specialist, the
3   neurosurgeon that would -- we would need their
4   recommendations prior to initiating any further
5   consult for surgery.
6       Q.   And the neurosurgeon you're speaking of is
7   an outside provider?
8       A.   Correct.
9       Q.   Okay.  So if you had a recommendation from
10  an outside neurosurgeon that said Mr. Cowher needed
11  surgery, what would have happened next?
12      A.   We would either schedule a -- either
13  schedule a follow-up with that neurosurgeon for a
14  repeat evaluation or we would schedule surgery.
15      Q.   Okay.  Did you know that Mr. Cowher had
16  been scheduled for surgery before he got to SCI
17  Mahanoy?
18      A.   Based on that note February 8th, it does
19  say that he told me that he was scheduled at county --
20  in the county system.  I'm sorry.  He did tell me that
21  he was seen by neurosurgery in the county system twice
22  with recommendations for surgery, but I do not note
23  that I knew of a date that he was scheduled for
24  surgery.

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

Cowher v. Lowe, et al.                    COURTNEY PATRICK RODGERS, D.O., 1/25/19

Page 21

1    Q.   Okay.  And based on what Mr. Cowher told
2    you, am I understanding you to say that that wasn't
3    good enough to make sure he got surgery?
4        MS. GOODRICH:  I'm sorry.  Objection to
5    form.  Are you saying what Mr. Cowher told him is
6    not good enough?
7        MR. MOSSER:  Yeah.
8        MS. GOODRICH:  Just his verbal assurances?
9        MR. MOSSER:  Yeah.
10       THE WITNESS:  I'm not a neurosurgeon, so I
11   can't tell you what is or is not good enough for
12   surgery.  That is what the surgeon is for.
13   BY MR. MOSSER:
14       Q.   Okay.  And why didn't you, having had
15   that, or having written that, why didn't you suggest a
16   consult for an MRI?
17       A.   Because he had already had an MRI
18   completed.
19       Q.   Having had an MRI completed, why didn't
20   you suggest a consult for surgery?
21       A.   Because he had already been consulted by
22   neurosurgery per his report.
23       Q.   Okay.  So what did Mr. Cowher have to do
24   to get a surgery then?

Page 22

1        A.   What we needed, as an entity at CCS, was
2    the record from prior evaluation and recommendation
3    from neurosurgery.
4        Q.   Okay.
5        A.   And we did not obtain those.
6        Q.   Okay.  If you had a record -- if you had a
7    record that showed that he was scheduled for surgery,
8    what would -- what would Correct Care Solutions have
9    done?
10       MS. GOODRICH:  Objection to form.  What do
11   you mean by record?
12   BY MR. MOSSER:
13       Q.   If you had a piece of paper that said
14   Myron Cowher is scheduled for surgery on January 15th,
15   and Myron Cowher had come to see you before January
16   15th, what would you have done?  Would you have tried
17   to make sure he got the surgery?
18       A.   Are you asking a question if he had come
19   from a different system with surgery scheduled?
20       Q.   Yes.
21       A.   Coming into the CCS systems, since CCS
22   does take on that cost, we have to go through the
23   whole process of reassuring that medical
24   evaluation was completed and get proper

Page 23

1    recommendations.
2        After that process is completed, then we
3    could get them scheduled for surgery through the same
4    neurosurgeon ideally.
5        Q.   Do you know why or can you tell me why you
6    have to go through that whole process again?
7        A.   I do not.
8        Q.   Okay.  Just give me a minute.  I think
9    we're almost done, actually.
10                  *  *  *
11       (Pause)
12                  *  *  *
13       Q.   Do you know how I could find out whether
14   the nurse -- the nurses involved here communicated
15   your request for records?
16       A.   I do not.
17       Q.   Okay.
18       A.   However, the signature and the stamp is
19   acknowledgment of that order.  So the assumption would
20   be that the nurse would carry out that task.
21       Q.   That's an assumption, right?
22       A.   Yes.  I don't follow up on all orders.
23       Q.   Okay.  So I just want to make sure I
24   understand correctly, and correct me if I'm wrong.

Page 24

1    I'm going try to summarize what I'm learning here
2    today.
3        The reason why Myron Cowher didn't get
4    surgery while he was at Mahanoy is because you and
5    other medical staff didn't have all the records you
6    needed.  Is that right?
7        A.   I would say that's a fair assumption, or a
8    fair assessment.
9        MR. MOSSER:  Okay.  That's all I have.
10       MR. NINOSKY:  No questions.
11       MS. GOODRICH:  I actually have a few
12   follow-up questions for you.
13                  *  *  *
14       EXAMINATION
15                  *  *  *
16   BY MS. GOODRICH:
17       Q.   We were talking about the medical records
18   and the process of obtaining medical records.  The
19   individuals who work in the medical records
20   department, are they employed by CCS?
21       A.   No, they are not.  They're Department of
22   Corrections.
23       Q.   Does anybody at CCS supervise those
24   individuals in the medical records department?

6  (Pages 21 to 24)

Cowher v. Lowe, et al.                          COURTNEY PATRICK RODGERS, D.O., 1/25/19

Page 25

1    A.    No.
2    Q.    And these nurses, Alice Dudeck and
3  Elizabeth Holden, who -- and any other nurses who take
4  off the orders and send them to medical records, are
5  they employed by CCS?
6    A.    No.
7    Q.    Who are they supervised by?
8    A.    Nursing supervisors here, but overall
9  they're Department of Corrections as well.
10   Q.    Does anybody at CCS supervise the nurses?
11   A.    No.
12   Q.    And with regard to medical records, my
13  understanding, as you testified today, that you can
14  write an order to obtain medical records, correct?
15   A.    Correct.
16   Q.    Okay.  And let's say you learned, as we do
17  here, that a month later the records still were
18  obtained and it seems that you wrote another request
19  for medical records, correct?
20   A.    Yes.
21   Q.    What can you do, if you still don't
22  receive the records?  What can you do to ensure that
23  medical records are obtained?
24   A.    I informally will walk down to the

Page 26

1  department and ask for them to try to get those
2  records.
3    Q.    Is there anything you can do to intervene
4  in the process at all?
5    A.    No.
6    Q.    And what I say, take over the process to
7  obtain medical records?
8          Is that a no?
9    A.    No.
10   Q.    Is there anybody at CCS that can take over
11  the role of medical records department?
12   A.    No.
13   Q.    So you have to rely upon the DOC to get
14  those records, correct?
15   A.    Yes.
16   Q.    Do you recall specifically whether you
17  went to the medical records department to ask why
18  records were not yet received?
19   A.    I do not.
20   Q.    And we're going over a little bit about
21  the consult process.  I do want to go over that a bit
22  more.
23          So in this case, as you've learned, we
24  have a patient who comes into Mahanoy who has a

Page 27

1  previously scheduled surgery and that was scheduled
2  while at county.  So it was not approved by CCS, it
3  was approved by an outside provider, comes into
4  county.
5          In that situation, how do we go about --
6  what's the process for ensuring that he can go forward
7  with that surgery if it's deemed medically necessary?
8    A.    If we -- like I said, if we obtain all
9  those medical records from outside evaluation, the
10  workup, and they're deemed medically necessary, then
11  we can move forward with the surgery -- with consult
12  for surgery.
13   Q.    When you say all of those records, is --
14  you know, you were looking at a couple of MRI's.  Are
15  these MRI's enough for you to be able to write that
16  consult?
17   A.    No.
18   Q.    Is a note from Prime Care saying he's
19  scheduled to have surgery enough?
20   A.    No.
21   Q.    You would actually need the actual
22  progress note from the outside provider, correct?
23   A.    Correct.
24   Q.    What's the reason why you need to have

Page 28

1  that documentation prior to writing the consult?
2    A.    So we can determine whether it's medically
3  necessary for the surgery as opposed to elective.
4    Q.    And I know you only -- you only wrote two
5  notes in the record, but in either one of your notes
6  was there any indication that you saw in either note
7  that Mr. Cowher was in an abundance of pain?
8    A.    No.  My NAD is nomenclature for no acute
9  distress, which would entail pain or respiratory
10  distress.  Any type of distress.
11   Q.    If he was -- say if he was grimacing,
12  would that be something that you would document?
13   A.    Correct.
14   Q.    Okay.  If he was holding his back and
15  stumbling in, would that be something you document?
16   A.    Yes, it would.
17   Q.    If he came in in a wheelchair because he
18  couldn't walk, would that be something you'd document?
19   A.    Yes, it would be.
20   Q.    Are you aware of the grievance process in
21  the Department of Corrections?
22   A.    Yes, I am.
23   Q.    If an inmate came to you and asked for a
24  grievance form, is that something you'd be able to

7  (Pages 25 to 28)

Page 29

```
1    provide to him?
2        A.   Not myself specifically, but I could ask
3    nursing or nursing supervisors to provide such a
4    grievance form.
5        Q.   Do you recall Mr. Cowher ever asking you
6    for a grievance form?
7        A.   No.
8        Q.   If he had asked you, what would you have
9    done?
10       A.   I would have requested one of the nurses
11   provide such form or one of the nursing supervisors.
12           MS. GOODRICH:  Those are all the questions
13   I have.
14                      * * *
15                 EXAMINATION
16                      * * *
17   BY MR. MOSSER:
18       Q.   Do you remember whether you informally
19   walked to medical records to ask that they get the
20   records?
21       A.   I do not.
22       Q.   You don't remember or you didn't do it?
23       A.   I do not remember.  It would be --
24   normally be my practice, though.
```

Page 30

```
1        Q.   Okay.
2        A.   On a second time.  I wouldn't do it the
3    first time.  The second time, if they had not arrived,
4    I would typically go up and say, please obtain these
5    records.
6        Q.   Okay.
7            MR. MOSSER:  Okay.  That's all I have.
8            MR. NINOSKY:  Nothing.
9            MS. GOODRICH:  Thank you, Doctor.  Let me
10   walk you out.
11                      * * *
12               (Witness excused.)
13                      * * *
14           (Whereupon, the deposition was concluded
15   at 10:52 a.m.)
16
17
18
19
20
21
22
23
24
```

Page 31

```
1               C E R T I F I C A T E
2
3            I, Nancy J. Taguinot, RPR, CCR(NJ),
4    Registered Professional Reporter and Notary Public in
5    and for the Commonwealth of Pennsylvania, certify that
6    the foregoing is a true and accurate transcript of the
7    deposition of said witness, who was first duly sworn
8    by me on the date and place hereinbefore set forth.
9
10           I further certify that I am neither attorney
11   nor counsel for, nor related to or employed by, any of
12   the parties to the action in which this deposition was
13   taken, and further, that I am not a relative or
14   employee of any attorney or counsel employed in this
15   action, nor am I financially interested in this case.
16
17
18
19
20           Nancy J. Taguinot, RPR, CCR(NJ)
             Notary Public
21           New Jersey License No. XI01005
22
23
24
```

Page 32

```
1            INSTRUCTIONS TO THE WITNESS
2            Read your deposition over carefully
3    It is your right to read your deposition and make
4    changes in form or substance.  You should assign a
5    reason in the appropriate column on the errata
6    sheet for any change made.
7            After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11           Then sign your deposition at the
12   end of your testimony in the space provided.  You
13   are signing it subject to the changes you have
14   made in the errata sheet, which will be attached
15   to the deposition before filing.  You must sign it
16   in front of a witness.  Have the witness sign in
17   the space provided.  The witness need not be a
18   notary public.  Any competent adult may witness
19   your signature.
20           Return the original errata sheet to
21   your counsel promptly.  Court rules require filing
22   within thirty days after you receive the
23   deposition.
24
```

**Cowher v. Lowe, et al.**                    **COURTNEY PATRICK RODGERS, D.O., 1/25/19**

Page 33

```
 1              ERRATA SHEET
 2    Attach to Deposition of: Courtney Patrick Rodgers, D.O.
      Taken on: January 25, 2019
 3    In the matter of: Lowe, et al.
 4    PAGE     LINE NO.    CHANGE      REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
```

Page 34

```
 1              SIGNATURE PAGE
 2
 3              - - -
 4
 5         I hereby acknowledge that I have
 6    read the aforegoing transcript, dated January 25,
 7    2019, and the same is a true and correct
 8    transcription of the answers given by me to the
 9    questions propounded, except for the changes, if
10    any, noted on the Errata Sheet.
11
12              - - -
13
14
15
16
17    SIGNATURE:    _____
                 Courtney Patrick Rodgers, D.O.
18
19    DATE:        _____
20
21    WITNESSED BY: _____
22
23
24
```

9  (Pages 33 to 34)

**COURTNEY PATRICK RODGERS, D.O.**

1                 C E R T I F I C A T E

2

3          I, Nancy J. Taguinot, RPR, CCR(NJ),

4    Registered Professional Reporter and Notary Public in

5    and for the Commonwealth of Pennsylvania, certify that

6    the foregoing is a true and accurate transcript of the

7    deposition of said witness, who was first duly sworn

8    by me on the date and place hereinbefore set forth.

9

10         I further certify that I am neither attorney

11   nor counsel for, nor related to or employed by, any of

12   the parties to the action in which this deposition was

13   taken, and further, that I am not a relative or

14   employee of any attorney or counsel employed in this

15   action, nor am I financially interested in this case.

16

17

18

19   _____

20   Nancy J. Taguinot, RPR, CCR(NJ)
     Notary Public

21   New Jersey License No. XI01005

22

23

24

Case 3:16-cv-02259-KM   Document 83   Filed 04/04/19   Page 18 of 27

Cowher v. Lowe, et al.                                    COURTNEY PATRICK RODGERS, D.O., 1/25/19

**A**

a.m 1:15 30:15
able 27:15 28:24
abundance 28:7
accurate 31:6
acknowledge 34:5
Acknowledged 14:9
acknowledgment 23:19
action 11:22 31:12 31:15
ACTION-LAW 1:5
actual 27:21
acute 28:8
adult 32:18
aforegoing 34:6
agree 9:6
agreed 4:2
al 1:8 33:3
Alice 13:16 14:3 25:2
alternate 11:1
answers 4:23 34:8
anybody 24:23 25:10 26:10
appropriate 32:5
approval 10:19
approve 11:1
approved 27:2,3
arrived 30:3
asked 19:23 28:23 29:8
asking 18:21 22:18 29:5
assessing 15:13
assessment 24:8
assign 32:4
assigned 8:22
assignment 8:20
assistant 2:12,13 13:24
Assuming 19:11
assumption 23:19 23:21 24:7
assurances 21:8
Attach 33:2
attached 5:12 32:14
attorney 31:10,14
aware 28:20

**B**

B 3:7
back 28:14
base 9:8
based 7:10 16:19

20:18 21:1
beginning 1:15
believe 11:6 17:10
beyond 16:23
bit 26:20,21
bottom 15:8
brought 7:11,15
BSN 2:15

**C**

C 2:1 11:24 31:1,1
C.R.N.P 13:24
CAITLIN 2:19
Camp 2:9,16 8:20
capabilities 17:18
capacity 10:10,11
Care 2:22 5:20 8:10 10:9 22:8 27:18
carefully 32:2
carry 23:20
case 26:23 31:15
cause 7:18
caused 19:8
CCHP 2:14,14
CCR(NJ) 1:16 31:3 31:20
CCS 9:21 22:1,21 22:21 24:20,23 25:5,10 26:10 27:2
Center 2:8
centers 8:19
CEO 2:15
certification 4:4
certified 1:22 13:24
certify 31:5,10
cervical 7:3,9
cgoodrich@wgla... 2:21
change 32:6,9 33:4
changes 32:4,7,13 34:9
channels 16:1,2 19:5,12
chart 14:6
charts 17:18
CIVIL 1:5
clarify 12:16
clear 19:9
COLEMAN 2:7
column 32:5
come 8:18,19 22:15 22:18
comes 8:11 26:24 27:3
coming 16:1 22:21
Commonwealth

1:17 31:5
communicated 23:14
competent 32:18
complete 15:17 19:4
completed 14:10 21:18,19 22:24 23:2
completely 19:9
concluded 30:14
considered 20:2
consult 10:12,18,22 11:4 19:22,23 20:5 21:16,20 26:21 27:11,16 28:1
consulted 21:21
contact 9:15
Corporate 2:8
correct 2:22 5:19 8:10 9:9,18 10:1,9 15:11 17:13 20:8 22:8 23:24 25:14 25:15,19 26:14 27:22,23 28:13 34:7
Correctional 2:12
Corrections 2:15 24:22 25:9 28:21
correctly 9:1 23:24
cosign 12:18 13:21
cost 22:22
counsel 4:3 19:16 31:11,14 32:21
county 2:11,12 8:5 20:19,20,21 27:2 27:4
couple 4:21 6:5 27:14
Court 1:1,21,22 32:21
Courtney 1:12 3:3 4:8 5:9 6:16 12:11 33:2 34:17
Cowher 1:5 4:18 6:2 7:6 9:21 18:8 19:13 20:10,15 21:1,5,23 22:14 22:15 24:3 28:7 29:5
Craig 1:8 2:11
current 5:19
Curriculum 3:10
CV 5:9,10

**D**

D 3:1
D.O 1:13 3:3 4:8 6:16 12:11 33:2 34:17
date 20:23 31:8 32:10 34:19
dated 6:23 34:6
day 18:11
days 32:22
decision 11:18
deemed 27:7,10
Defendant 2:22
Defendants 1:8 2:11
DelBaso 2:16
Denise 2:14
DENNEHEY 2:7
department 2:15 16:15 24:20,21,24 25:9 26:1,11,17 28:21
deposition 1:12 4:18 30:14 31:7 31:12 32:2,3,11 32:15,23 33:2
Derek 2:14
DESCRIPTION 3:9
despite 15:22
determine 11:21 28:2
different 17:6,9 22:19
director 5:21 10:23
discs 7:4,9,19
discuss 11:21
discussed 7:24 10:24
discussion 12:2
distress 28:9,10,10
DISTRICT 1:1,2
DOC 9:16 16:9,10 26:13
Doctor 30:9
document 18:8,9 18:11,12 19:7,8 19:11 28:12,15,18
documentation 28:1
Dr 4:15 9:24 10:24 11:21 18:3
Drive 2:8
Dudeck 13:17 14:3 25:2
duly 4:9 31:7

**E**

E 2:1,1,13 3:1,7

31:1,1
E-MAIL 2:5,10,21
either 5:4 19:2 20:12,12 28:5,6
elective 28:3
electronic 17:7,12
Elizabeth 16:21 25:3
employed 24:20 25:5 31:11,14
employee 31:14
ensure 25:22
ensuring 27:6
entail 28:9
entity 22:1
errata 32:5,9,10,14 32:20 33:1 34:10
Esq 2:15
ESQUIRE 2:2,8,19
et 1:8 33:3
evaluation 8:8 10:20 20:14 22:2 22:24 27:9
EXAMINATION 4:12 24:14 29:15
examined 4:10
exams 19:20
excused 30:12
Exhibit 5:13,15 6:7 6:9 12:5,10 17:20 17:23 18:4
expand 7:7
explain 14:7

**F**

F 31:1
Facility 2:12
fair 14:18 15:3,5 24:7,8
faxed 11:14,17
February 6:23 14:12,18 20:18
feel 10:21
fifth 7:23
filing 4:4 32:15,21
finally 8:22
financially 31:15
find 23:13
findings 10:20 18:14,16,17,21
FIRES 2:18
first 4:9 5:8 6:6,12 13:2 30:3 31:7
Fleming 1:23
follow 8:1 23:22
follow-up 20:13 24:12

Case 3:16-cv-02259-KM   Document 83   Filed 04/04/19   Page 19 of 27

Cowher v. Lowe, et al.                                    COURTNEY PATRICK RODGERS, D.O., 1/25/19

following 32:8
follows 4:10
foregoing 31:6
form 3:12 4:5 9:3
    9:20 14:21 16:24
    17:4,11 18:19
    21:5 22:10 28:24
    29:4,6,11 32:4,7
formal 15:19
forth 31:8
forward 19:16 27:6
    27:11
four 7:23
Frackville 1:14
Friday 1:14
front 32:16
full 17:7
further 20:4 31:10
    31:13

**G**

GALLAGHER 2:18
generated 17:1,4
give 23:8
given 15:12 34:8
go 6:5 8:19 11:23
    13:13 16:12,17
    17:19,20 22:22
    23:6 26:21 27:5,6
    30:4
goes 10:18 16:9
    17:10
GOGGIN 2:7
going 16:3 24:1
    26:20
good 4:15,16 5:8
    21:3,6,11
Goodrich 2:19 3:5
    9:3,6,20 12:13,21
    14:7,21 18:19,24
    21:4,8 22:10
    24:11,16 29:12
    30:9
gotten 11:12 19:4,7
grievance 28:20,24
    29:4,6
grimacing 28:11
ground 4:21
guys 6:12

**H**

H 3:7
Hammonton 1:23
handwriting 14:16
happen 8:15
happened 20:11

Hardy 2:16
Haskins 2:15
head 5:1
hearing 9:1 15:21
held 12:2
helped 8:24
hereinbefore 31:8
herniated 7:4,8,19
Hill 2:9,16 8:20
Holden 16:21 25:3
holding 28:14
home 8:18,23 9:8
home-based 8:17
HSA 2:14
Hughes 2:14

**I**

ideally 8:12,13 23:4
identification 5:16
    6:10 12:6 17:24
included 7:4
including 8:4
indication 28:6
individuals 24:19
    24:24
informally 25:24
    29:18
information 9:15
    16:5,5 17:11
    19:14,15,17
informing 16:22
informs 17:1
initially 8:18
initiating 20:4
inmate 10:17 15:12
    15:14,20 28:23
instance 9:17 11:3
    11:4,11
institution 8:18,23
INSTRUCTIONS
    32:1
intake 8:19
interested 31:15
intermittent 7:22
intervene 26:3
involved 23:14
issues 7:3

**J**

J 1:16 2:12,14 31:3
    31:20
January 1:15 5:23
    12:22 17:14 22:14
    22:15 33:2 34:6
Jeminola 2:14,14
Jersey 1:23 31:21

JOHN 2:8
Jonathan 2:12
jrninosky@mdw...
    2:10

**K**

Kendle 2:13
kind 7:18
knew 7:5 20:23
know 4:22 7:8 13:9
    15:16 16:24 17:3
    20:15 23:5,13
    27:14 28:4

**L**

L.P.N 14:3
Laurel 2:16
learned 25:16 26:23
learning 24:1
left 6:23
LEGAL 2:2
let's 11:23 17:20
    19:4 25:16
License 31:21
line 7:2,23 13:2
    33:4
little 26:20
LLC 2:22
LLP 2:18
look 15:15
looked 7:11 15:13
looking 14:20 15:1
    27:14
looks 6:6 7:10 10:2
lost 9:2
Lowe 1:8 2:12 33:3

**M**

machine 10:13,15
Mahanoy 1:13 2:16
    5:22 20:17 24:4
    26:24
making 17:2 32:7
manner 11:16
mark 6:7 17:20
marked 3:9 5:15 6:9
    12:5 17:23 18:3
Market 2:19
MARSHALL 2:7
matter 33:3
MBA 2:14
McLaughlin 2:13
mean 8:14 13:6,23
    17:8 22:11
means 14:8
medical 2:13 3:11

5:21 9:14,15,18
    10:23 16:3,9,10
    16:14,17,22 17:1
    17:7 22:23 24:5
    24:17,18,19,24
    25:4,12,14,19,23
    26:7,11,17 27:9
    29:19
medically 11:10
    27:7,10 28:2
middle 1:2 6:15
    13:12
midlevel 13:23
midlevels 12:18
    13:21
minute 23:8
moment 18:13
month 25:17
Morea 1:13
morning 4:15,16
Mosser 2:2,2 3:5
    4:14,17 5:18 6:12
    6:14 9:5,10,23
    12:8,15,23 13:1
    14:11,22 18:2,23
    19:3 21:7,9,13
    22:12 24:9 29:17
    30:7
move 19:16 27:11
MRI 3:14 7:16,20,21
    10:10,12,13,17,21
    11:5,10,11,12,12
    11:19 13:3,7,9
    18:4,18,22,22
    19:23,24 21:16,17
    21:19
MRI's 27:14,15
Myron 1:5 4:17 6:2
    9:21 22:14,15
    24:3

**N**

N 2:1,3 3:1
NAD 28:8
name 4:17 6:4
    13:10 32:10
names 13:15
Nancy 1:15 13:8,16
    13:18 31:3,20
necessary 11:10
    27:7,10 28:3
need 8:2 15:22
    17:19 20:3 27:21
    27:24 32:17
needed 14:19 18:18
    20:10 22:1 24:6
neither 31:10

neurology 19:21
neurosurgeon
    14:14 18:20 20:3
    20:6,10,13 21:10
    23:4
neurosurgeons
    15:1
neurosurgery 8:4,5
    11:9 15:7 19:21
    20:21 21:22 22:3
New 1:23 31:21
NEWBY 2:18
NINOSKY 2:8 24:10
    30:8
nods 4:24
nomenclature 28:8
normally 29:24
notary 1:17 31:4,20
    32:18
note 6:20 10:2
    20:18,22 27:18,22
    28:6
noted 32:8 34:10
notes 6:6 14:13,24
    15:6,24 28:5,5
NUMBER 3:9
nurse 14:1,4 16:21
    17:1 23:14,20
nurses 16:20 23:14
    25:2,3,10 29:10
nursing 25:8 29:3,3
    29:11

**O**

Objection 9:3,20
    14:21 18:19 21:4
    22:10
objections 4:5
objectives 10:21
observed 10:7,8
obtain 7:24 9:16
    14:13 15:9 16:10
    20:1 22:5 25:14
    26:7 27:8 30:4
obtained 9:8,11,14
    25:18,23
obtaining 10:11
    24:18
office's 19:20
Okay 4:21 5:4,12,23
    6:5,20,23 7:2,12
    7:15,18,21 8:7,13
    9:1,5,11,17 10:7
    10:17 11:2,15,23
    13:6,13,15 14:2,5
    14:12 15:8,8,16
    15:20 16:17 17:5

Case 3:16-cv-02259-KM   Document 83   Filed 04/04/19   Page 20 of 27

Cowher v. Lowe, et al.                                    COURTNEY PATRICK RODGERS, D.O., 1/25/19

17:14,19 18:7,12
18:15 19:17 20:9
20:15 21:1,14,23
22:4,6 23:8,17,23
24:9 25:16 28:14
30:1,6,7
once 8:16,22 9:8
Open 3:14 18:4
opposed 28:3
Oral 1:12
order 3:12 9:14
12:17,20 13:18
14:4,5,8,9,16 16:8
23:19 25:14
orders 23:22 25:4
original 32:20
outpatient 19:19
outside 8:4 9:13
11:9 20:7,10 27:3
27:9,22
overall 25:8

**P**

P 2:1,1
P.A 13:14
page 3:4,11 6:13,15
11:23 12:10 33:4
34:1
pain 7:23 28:7,9
Palmigiano 13:8,16
paper 13:10 14:6
17:18 22:13
paperwork 7:3,11
7:12,16,18 10:3,4
17:1
part 19:15
partial 17:16
parties 4:3 31:12
path 11:1
patient 7:22 8:11
26:24
Patrick 1:12 3:3 4:8
5:9 33:2 34:17
Pause 23:11
PC 3:14
Pennsylvania 1:2
1:14,18,23 2:4,9
2:15,20 31:5
people 8:23
Philadelphia 1:23
2:4,20
Physician 13:24
Physician's 3:12
picture 6:4
piece 13:10 22:13
Pike 1:23 2:11,12
place 31:8

Plaintiff 1:6 2:6
plan 11:21
please 14:13 15:9
30:4
PLLC 2:2
point 15:3
position 5:19,23
possession 8:10
practice 29:24
practitioner 14:1
previously 14:14
14:24 27:1
Prime 27:18
Primecare 2:13
prior 7:3 8:3 10:3
11:8 15:19,24
16:5 20:4 22:2
28:1
procedure 16:23
process 10:18 17:6
17:8 22:23 23:2,6
24:18 26:4,6,21
27:6 28:20
Professional 1:16
31:4
progress 6:6 27:22
promptly 32:21
proper 16:1,2 19:5
19:12 22:24
propounded 34:9
provide 11:1 15:20
29:1,3,11
provided 19:20
32:12,17
provider 11:9 15:19
20:7 27:3,22
providers 8:4 9:13
15:23 16:5
PT 7:3
public 1:17 31:4,20
32:18
put 8:16 9:13 16:7,8
putting 16:4

**Q**

question 4:6,22 7:7
9:24 19:2,10
22:18
QUESTIONED 3:4
questions 24:10,12
29:12 34:9
quick 4:21
quite 18:21,24

**R**

R 2:1,8 31:1

radiologist 18:20
radiology 3:14
17:21
read 32:2,3 34:6
really 16:19 20:2
reason 11:2 24:3
27:24 32:5,9 33:4
reassuring 22:23
recall 6:3 10:4 18:7
26:16 29:5
receive 25:22 32:22
received 26:18
recognize 6:4,4
recommendation
20:9 22:2
recommendations
14:13,24 15:6
16:1 20:4,22 23:1
recommended
11:12
record 3:14 4:24
12:3 17:7 22:2,6,7
22:11 28:5
records 3:11 7:24
8:2,6,9,17 9:2,7
9:11,14,15,16,18
9:21,22 10:1
14:19,23,23 15:9
15:12,19,21,23
16:4,9,10,11,14
16:18,22 17:2
19:5 23:15 24:5
24:17,18,19,24
25:4,12,14,17,19
25:22,23 26:2,7
26:11,14,17,18
27:9,13 29:19,20
30:5
referring 12:21
16:15
regard 25:12
regional 10:23
registered 1:16
14:1 31:4
related 31:11
relative 31:13
release 16:4
rely 26:13
remember 6:2 7:5
7:12,15 11:7
29:18,22,23
repeat 20:14
rephrase 4:23
report 7:21 17:21
18:22 21:22
Reporter 1:17 31:4
Reporters 1:22

REPORTING 1:21
reports 7:20
represent 4:17
Representing 2:6
2:11,22
request 15:19,22
16:4,7,12,17,22
17:2,11 23:15
25:18
requested 15:10
29:10
requests 9:13
require 11:8 15:24
19:15 32:21
reserved 4:6
respective 4:3
respiratory 28:9
results 11:13,19
Return 32:20
review 18:13
reviewed 7:2 10:1,3
18:11,12,16
right 5:2,5 8:21
12:9,24 13:12
23:21 24:6 32:3
right-hand 13:2
RN 2:14,14,15
Road 1:13
Robert 2:13
Rodgers 1:12 3:3
4:8,15 5:10 6:16
9:24 12:11 18:3
33:2 34:17
Rodgers-1 3:10
5:15
Rodgers-2 3:11 6:9
Rodgers-3 3:12
12:5
Rodgers-4 3:14
17:23
role 26:11
Romance 2:12
RPR 1:16 31:3,20
rules 4:21 32:21

**S**

S 2:1 3:7
Sapphire 17:10,12
17:15,16
saw 18:8 28:6
saying 9:21 21:5
27:18
says 5:9 6:16 7:2
7:22,24 12:11
13:3,3 14:13 15:8
18:5,14
schedule 20:12,13

20:14
scheduled 20:16,19
20:23 22:7,14,19
23:3 27:1,1,19
SCI 1:13 2:16,16
5:21 20:16
sealing 4:4
second 12:14 30:2
30:3
see 6:15,24 8:11
12:10 13:3 18:5
22:15
seen 8:5 10:19
14:14 15:1 20:21
send 25:4
services 19:19
set 31:8
sheet 32:6,9,10,14
32:20 33:1 34:10
show 6:7
showed 18:3 22:7
shown 12:9
side 13:2
sign 32:10,11,15,16
signature 12:19
13:22 23:18 32:19
34:1,17
signed 13:20
significant 7:3
10:20
signing 32:13
SIMPSON 2:18
sit 18:16
site 5:21 8:16,17
situation 27:5
Solutions 2:22 5:20
10:9 22:8
sorry 20:20 21:4
sought 16:6
space 32:12,17
speaking 20:6
specialist 19:19
20:2
specific 9:14 17:4
specifically 6:3
18:10 26:16 29:2
spine 13:3,7,9
stack 15:21
staff 24:5
stamp 6:16,18
12:11,19 13:22
23:18
stamped 13:20
STAPLETON 2:18
states 1:1 7:22
stipulated 4:2
Street 1:22 2:3,19

Cowher v. Lowe, et al.                                    COURTNEY PATRICK RODGERS, D.O., 1/25/19

strike 16:12
stumbling 28:15
subject 32:13
subjective 10:21
submit 10:22
substance 32:4,8
suggest 11:4 21:15
  21:20
Suite 1:22 2:3,9,19
summarize 24:1
SUMMIT 1:21
Superintendent
  2:16
supervise 24:23
  25:10
supervised 25:7
supervisors 25:8
  29:3,11
supposed 16:7
sure 7:8 18:21,24
  21:3 22:17 23:23
surgeon 21:12
surgery 20:1,5,11
  20:14,16,22,24
  21:3,12,20,24
  22:7,14,17,19
  23:3 24:4 27:1,7
  27:11,12,19 28:3
sworn 4:9 31:7
system 17:12,17
  20:20,21 22:19
systems 22:21

T
T 3:7 31:1,1
Taguinot 1:16 31:3
  31:20
take 10:10 16:20
  18:13 22:22 25:3
  26:6,10
taken 1:13 4:18
  31:13 33:2
talking 12:13 24:17
task 14:10 16:20
  23:20
tasked 16:10
TEL 2:4,10,20
tell 16:19 20:20
  21:11 23:5
testified 4:10 25:13
testifying 9:7
testimony 32:12
Thank 30:9
Theresa 2:16
thing 5:3,8 6:7 7:22
  15:9
think 7:19 9:4 18:17

23:8
thirty 32:22
Thomas 2:14
three 7:23
time 4:6 8:11 10:23
  11:20 13:14 15:7
  17:3,17 30:2,3,3
timely 11:16
titled 18:4
today 18:17 24:2
  25:13
Todd 2:2,15 4:17
todd@mosserleg...
  2:5
told 20:19 21:1,5
top 5:9 7:2 12:10,14
  12:15,17,17,18,19
  13:18
transcript 31:6 34:6
transcription 34:8
treatment 19:13
trial 4:6
tried 22:16
true 31:6 34:7
try 4:23 24:1 26:1
twice 20:21
two 7:23 13:15 28:4
type 10:3 19:14,15
  20:1 28:10
typically 8:10,23
  10:19 11:8 30:4

U
Uh-huh 13:19 19:6
uh-huhs 5:3
understand 4:22
  5:6 19:1 23:24
understanding
  21:2 25:13
UNITED 1:1
Upstate 3:14

V
verbal 4:24 21:8
Videographers
  1:22
visit 14:13,24 15:6
Vitae 3:10
vs 1:7

W
W 2:15
waived 4:4
walk 25:24 28:18
  30:10
walked 29:19

Walnut 1:22
want 6:5,7 23:23
  26:21
Warden 2:12,13,13
WARNER 2:7
warrant 11:10
  18:17
warranted 10:22
wasn't 21:2
way 8:15
we'll 5:12 6:7 17:20
we're 8:17,17 17:6
  23:9 26:20
Weber 2:14,18
went 26:17
wheelchair 28:17
Wiener 10:24 11:21
Williamsport 3:14
  18:5
witness 2:22 3:3
  9:9 12:16,24 14:9
  19:1 21:10 30:12
  31:7 32:1,16,16
  32:17,18
WITNESSED 34:21
work 5:4 24:19
workup 8:3,8 11:9
  27:10
wouldn't 15:18 30:2
write 6:20 25:14
  27:15
writing 28:1
written 13:7,18
  21:15
wrong 23:24
wrote 9:24 13:9
  14:15 25:18 28:4
www.summitrep...
  1:24

X
X 3:1,7
x-ray 10:15
XI01005 31:21

Y
Yeah 18:23 19:1
  21:7,9
yeahs 5:3

Z

0
01/31/19 3:13
08037 1:23

1
1 5:13
10:24 1:15
10:52 30:15
100 2:8
12 3:12
1300 2:19
13th 2:3
1500 1:22
15th 22:14,16
1610 1:22
17 3:14 5:24
17011 2:9
17932 1:14
19102 1:23
19103 2:20
19107 2:4

2
2 6:7 11:24
2/9/17 3:11
2000 2:19
201 2:9
2017 6:24 12:22
  14:12,19 17:14
2019 1:15 33:2 34:7
211 2:3
215 1:24 2:4
24 3:5
25 1:15 33:2 34:6
267 2:20
29 3:5
295-3367 2:20

3
3 12:10
3/1/17 15:9
3:16-CV-02259 1:8
301 1:13
31st 12:22

4
4 3:5 17:20 18:4
424 1:23
447-8648 1:24

5
5 3:10
567-1220 2:4
567-3315 1:24

6
6 3:11
609 1:24
651-3709 2:10

7
717 2:10

8
800 1:24
801 2:3
8th 6:24 14:12,19
  20:18

9
985-2400 1:24


EXHIBIT
Rodgers-1
1/25/19 NT

# Courtney Patrick Rodgers

**EDUCATION:**

**Lake Erie College of Osteopathic Medicine**   Bradenton, FL
*Doctor of Osteopathy*   June 2011
Problem Based Learning curriculum

**University of Kansas**   Lawrence, KS
*Bachelor of Science in Human Biology*   May 2004
Overall GPA 3.5
Science GPA 3.8

**INTERNSHIP AND RESIDENCY:**

**Grandview Hospital**   Dayton, OH
*Emergency Medicine Residency*   June 2012-
February 2014
317 bed urban hospital with a 22 bed emergency department.  Rotations completed while in residency included six rotations in the ED, two Trauma/SICU rotations at Level 1 Trauma center Grant Medical Center in Columbus Ohio, two pediatric EM rotations at Dayton Children's Hospital and one Ultrasound rotation

**St. Lukes Osteopathic Hospital**   Allentown, PA
*Traditional Rotating Internship*   June 2012

**WORK EXPERIENCE:**

**Correct Care Solutions**   Frackville, PA
*Site Medical Director – SCI Mahanoy*   July 2016-present

2500 male population state prison.  Clinical duties include chronic care clinic, sick call, 12 bed infirmary, infectious disease clinic. Various telemedicine clinics including oncology, dermatology, nephrology and orthopedics. Administrative duties include managing other onsite practitioners including a part time physician and 2 full time mid-levels.

**Amcare Inc., Doctor's Urgent Care**          **Dayton, OH**
*Physician – Full time*                        January 2015-June
                                               2016

Nine facility company servicing the Cincinnati and Dayton areas.  General low
acuity illnesses and injuries.  Physical examinations including pre-employment,
sports and DOT.  Occupational services including worker compensation claims.
Average patient load approximately 4 patients per hour.

ACTIVE STATE LICENSES:
    **Ohio Unrestricted Medical License, 34.011652** since Jan 2015
    **Pennsylvania Unrestricted Medical License, OS018095** since March 2016

PROFESSIONAL MEMBERSHIPS
    **American Osteopathic Association,** member since 2011
    **Emergency Medicine Resident's Association,** member since 2012

COMMUNITY
ACTIVITY:          **FIMRC mission trip to Trujillo, Peru,**
    **June-July 2008**
- Observing medical settings/conditions of Trujillo
- Setting up medical clinics in underserved areas
- Medical screening in underserved areas

**Florida Sheriff's Youth Ranch Mentoring program**
**Bradenton, FL**
**Aug 2007 to March 2009**
- Participating in activities such as sports and serving as a role model to
troubled boys

STRENGTHS/
SKILLS:
- Leadership skills, teamwork oriented, organized, resourceful, work well in
diverse environments, strong written/verbal communication, and able to take
on an array of responsibilities.
- Excellent troubleshooting and analytical skills.
- Excellent patient management skills, could routinely average 1.5-2
complicated ED patients an hour.
- Proficient with ultrasound
- DOT certified
- Extensive experience with Workers Compensation

EXHIBIT

PENGAD 800-631-6989
Rogers-2 #D
1/25/19 NT

Inmate Name:

Inmate Number:

| Date/Time | Discipline Abbreviation | Remarks<br>Subjective, Objective, Assessment, Plan |
|---|---|---|
| 2/8/17<br>1020 | mp line | S: Reviewed prior paperwork c̄ pt. Significant cervical issues including herniated disks. Pt states intermittent pain shoots down ® arm/back. States prior to incarceration and while in county system was seen by neurosurgery twice c̄ rec for surgery on C-spine. Discussed will obtain those rec and follow accordingly. Educated on current meds and need to give Pamelor up to 6 weeks for full effect.<br>O: W/c bound NAD Aª○○3<br>A: Cervical DJD c̄ tenderness<br>P: obtain records<br>  mp line in 4 weeks      Courtney Rodgers, DO<br><br>Crystal Schell, LPN |
| 2/17/17 Ndg | | ① show for S/C ——— CM Schell |
| 2/21/17<br>1115 | PAC | S: I/m to S/C to req to see someone "as a tingling sensation (L) back area. Denies pain, or itching or rash. Denies having varicella as a child but states he had the immunizations.<br>O: NAD. A: Ox3. Chart reviewed. Back has no rash, blisters or edema. c/o pain in (L) mid back. Already on Pamelor which I/m states is starting to help. Keep eye on area & if it worsens in any way, RTC.<br>A: Pain - Chronic<br>P: See above. f/m aware of above & has f/u c̄ MD in 2-3 wks. RTC ↑ Sx, prn<br><br>Nancy Palmigiano, PA-C    N Palmigiano PA |

# PHYSICIAN'S ORDER FORM

Cowher, Myron
MT 1479
02/19/63
SCI - Mahanoy

Drug Allergies: _NKDA_

| Date/ Military Time | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|
| 0/31/17 0845 | Sch for MD line re: Pain mgmt - MRI of Spine n Palmigiano DO PC Nancy Palmigiano, PA-C |
| | Noted AD Dudeck 2/1/17 @ 0900    2/1/17 1330 Alice Dudeck, LPN    Courtney Rodgers, DO |
| 2/8/17 0830 | 1 Please obtain visit notes and recommendations from previously seen neurosurgeon Rodwan Brijjoub M.D. ī Lycoming Neurosurgical Assoc. Ph # 570-326-2035   Fax: 570-326-9220 Courtney Rodgers, DO |
| | — MD line in 3-4 weeks re: pain, neuro sx M▴▾H A Holden LPN 2/8/17 1330 Elizabeth Holden, LPN |
| 3/1/17 1015 | ✓PLEASE OBTAIN ABOVE RECORDS AS REQUESTED Noted Courtney Rodgers, DO 3/1/17 227 C Hauser RN CHRISTINA HAUSER, RN |

EXHIBIT
Rodgers 3   TA
1/25/19  NT

PLEASE USE BALL POINT PEN ONLY

Revised 01/2013



**Upstate Radiology, PC**
**OPEN MRI OF WILLIAMSPORT**

Patient's Name: Cowher II, Myron
Patient Account #: 183000
Date of Service: 05/12/2016 (Williamsport)
Date of Birth: 02/19/1963
Referring Physician: Terry Belles MD
Exam: MRI of the Cervical Spine
Claim #: 75058-91716
DOI: 04/16/16

Comparison: MRI of right brachia plexus May 4, 2016.

Clinical history: Neck pain and right upper extremity radiculopathy.

Findings: There is no fracture, destructive osseous lesion, or dislocation seen. Moderate cervical spine spondylosis is seen. There is straightening of cervical spine lordosis that is consistent with muscle spasm. At C4-C5, central and left paracentral disc herniation is seen with transverse diameter of 1.3 cm, maximal AP diameter of 0.5 cm, and sagittal height of 1.1 cm that is markedly distorting the ventral contour of the spinal cord left of the midline. There is severe left lateral recess narrowing, moderate central canal stenosis, and mild right lateral recess narrowing at C4-C5. At C6-C7, there is a large right paracentral disc herniation with transverse diameter of 1.0 cm, AP diameter of 0.5 cm, and sagittal height of 0.9 cm severely narrowing the right lateral recess and the medial most aspect of right neural foramen. There is also mild distortion of the right ventral aspect of the spinal cord at C6-C7. No other disc herniation is seen; however, posterior lateral osteophytes are present at C5-C6 with moderate bilateral lateral recess narrowings. Intrinsic pathology of spinal cord is not identified.

CONTINUED ON PAGE TWO

The Health Information contained in this Fax/Report is Highly Confidential. It is intended for the exclusive use of the addressee. It is to be used only to aid in providing specific healthcare services to this patient. Any other use is a violation of Federal Law (HIPAA) and will be reported as such.

1786 ½ East 3ʳᵈ Street Williamsport, PA 17701   Tel. (570) 322-8060 Fax: (570) 322-8055



05/13/2016  10:52   5703228055               OPEN MRI OF WMSPT                    PAGE   02/02



## Upstate Radiology, PC
## OPEN MRI OF WILLIAMSPORT

Patient's Name:  Cowher II, Myron      -2-
Date of Service:  05/12/2016 (Williamsport)
Exam: MRI of the Cervical Spine

Impression:

1. Moderate cervical spine spondylosis.
2. Right paracentral disc herniation at C6-C7 with severe right lateral recess narrowing and mild distortion of spinal cord contour.
3. Prominent central/left paracentral disc herniation at C4-C5 with marked spinal cord distortion, moderate central canal stenosis, severe left lateral recess narrowing, and mild right lateral recess narrowing.
4. Moderate bilateral lateral recess narrowings at C5-C6 due to posterolateral osteophytes.
5. Reversal of normal cervical spine lordosis possibly secondary to muscle spasm.

Dictated by:  Kirwin Gibbs, MD on 05/12/2016 at 13:00:51
Electronically Approved by:  Kirwin Gibbs, MD
Signed on:  05/12/2016 14:03:56

Job Number:  552545

The Health Information contained in this Fax/Report is Highly Confidential. It is intended for the exclusive use of the addressee. It is to be used only to aid in providing specific healthcare services to this patient. Any other use is a violation of Federal Law (HIPAA) and will be reported as such.

1786 ½ East 3rd Street Williamsport, PA 17701   Tel. (570) 322-8060 Fax: (570) 322-8055