# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MYRON COWHER,

          Plaintiff,

    v.

PIKE COUNTY CORRECTIONAL
FACILITY, et al.,

          Defendants.

CIVIL ACTION NO. 3:16-CV-02259

(MEHALCHICK, M.J.)

## MEMORANDUM

Before the Court are two Motions for Summary Judgment submitted by both sets of Defendants, PrimeCare and Correct Care. For the reasons set forth herein, the Court grants the Defendants' motions for summary judgment.

### I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Myron Cowher ("Cowher" or "Plaintiff") commenced this action on November 10, 2016, while incarcerated at the Pike County Correctional Facility. (Doc. 1, at ¶ 1). The operative complaint in this action is Cowher's second amended complaint, filed on June 27, 2017 against the following Defendants: Pike County, Warden Craig A. Lowe, Assistant Warden Jonathan J. Romance, Assistant Warden Robert E. McLaughlin, PrimeCare Medical Inc., Kendle Jeminola, Denise Jeminola, Derek Hughes, Thomas J. Weber, Todd W. Haskins, the Pennsylvania Department of Corrections ("DOC"), Superintendent Theresa Delbalso of State Correctional Institute ("SCI") Mahanoy, Laurel Harry of SCI Camp Hill, and Correct Care Solutions. (Doc. 29, at 1-2).

Defendants DOC, Theresa Delbalso, Laurel Harry, Pike County, Craig A. Lowe, Jonathan J. Romance, and Robert E. McLaughlin were previously dismissed from this action.

(Doc. 44); (Doc. 56 at ¶ 2); (Doc. 70, at 1). The remaining defendants are PrimeCare Medical Inc., Kendle Jeminola, Denise Jeminola, Derek Hughes, Thomas J. Weber, Todd W. Haskins (the "PrimeCare Defendants" or "PrimeCare") and Correct Care. Cowher brings an Eighth Amendment deliberate indifference claim and a *Monell* claim against both the Prime Care and Correct Care Defendants. (Doc. 29, at 11; 19). Cowher also asserts state law claims against both Defendants. (Doc. 29, at 15; 17). Specifically, Cower alleges the Defendants acted unlawfully and with deliberate, intentional, willful, unreasonable, malicious, and/or reckless indifference to his need for surgery and to following his prescription medication regiment, by failing to recognize the need for medical attention, and failing to provide medical care, all in violation of his Eighth Amendment rights. (Doc. 29). Cowher's claims against the PrimeCare Defendants arise from his medical treatment by those defendants during his incarceration at the Pike County Correctional Facility from May 23, 2016 through November 17, 2016, when he was transferred to SCI-Graterford. (Doc. 72 at 6 ¶ 18; at 36 ¶ 132); (Doc. 73 at 7). His claims against Correct Care stem from his medical treatment at SCI Camp Hill, SCI Graterford, and SCI Mahanoy. (Doc. 77 at 1 ¶ 2).

Cowher seeks "compensatory damages, including damages for pain and suffering and emotional distress in excess of $75,000.00, as well as attorney's fees under 42 U.S.C. § 1988 and punitive damages, pre- and post- judgment interest, delay damages, and… other monetary relief." (Doc. 29 at 22).

Following the close of discovery, both the PrimeCare Defendants and Correct Care moved for summary judgment (Doc. 71; Doc. 75) and submitted briefs in support (Doc. 73; Doc. 76) and statements of material facts (Doc. 72; Doc. 77). Both the PrimeCare Defendants and Correct Care aver that the undisputed record does not support either Cowher's claim of

deliberate indifference to a serious medical need, his *Monell* claim, or his remaining state law claims of negligence and intentional infliction of emotional distress. Additionally, Correct Care submits that Cowher failed to exhaust his administrative remedies and is thus barred from pursuing his claims in this Court. Cowher filed briefs in opposition to the motions for summary judgment (Doc. 82; Doc. 84), and answers to each statement of facts (Doc. 81; Doc. 83). The PrimeCare Defendants filed a reply brief (Doc. 84) and an answer to Cowher's responsive statement of facts (Doc. 86).

Both motions for summary judgment are ripe for review. The following facts are material to the motions for summary judgment.[1]

## A. COWHER'S PRE-INCARCERATION MEDICAL HISTORY

In 2008, Cowher underwent surgery for a right meniscus tear and for left-sided arthritis. (Doc. 72, at ¶ 1). On April 16, 2016, Cowher suffered a work-related injury. (Doc.

---

[1] The material facts from the movant's statement of facts will be deemed admitted, unless the opposing party specifically disputes that fact in its response. *See* M.D. Pa. Local Rule ("LR") 56.1. Although separate counterstatements of fact not directly responsive to the movant's statement of fact are not contemplated by the Local Rule, the Court may consider the entire record to ascertain the relevant factual background for this matter, but the Court may assign those additional statements no evidentiary value. *Rau v. Allstate Fire & Cas. Ins. Co.*, No. 3:16-CV-0359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018); *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F. Supp. 2d 517, 519 n.1 (M.D. Pa. 1999); see also *Ball v. Buckley*, No. 1:11-CV-1829, 2012 WL 6681797, at *1 (M.D. Pa. Dec. 21, 2012) (declining to strike counterstatements of fact not directly responsive to the statement of material fact in support of a motion, so that litigation could proceed without the unnecessary delay that would be caused by striking the counterstatements and directing the plaintiff to attempt to file a new counterstatement that more closely adheres to the Local Rules of this Court.).

72, at ¶ 2). On April 27, 2016, Cowher saw medical providers at a MedExpress and reported that he was suffering from shoulder and back pain, as well as leg numbness, stemming from his work-related injury. (Doc. 72, at ¶ 2). Cowher received X-Rays, which did not reveal any significant medical abnormality, and MedExpress recommended that Cowher receive an MRI. (Doc. 72, at ¶¶ 3-4). Cowher underwent three MRI's in early May 2016, none of which noted an urgent need for surgery. (Doc. 72, at ¶¶ 7-8, 10).

On May 10, 2016, a MedExpress physician "recommended that MedExpress arrange for the cervical spine MRI and re-schedule the neurosurgery appointment that was previously scheduled to occur on June 21, 2016, to occur sooner." (Doc. 72, at ¶ 9). Cowher met with Dr. Dana Louise Vanino, a neurologist at Geisinger Medical Center, on May 19, 2016. (Doc. 72, at ¶ 12). Dr. Vanino recommended that Cowher be evaluated by a neurosurgeon. (Doc. 72, at ¶ 13). At his final evaluation at MedExpress on May 21, 2016, the physician noted "significant findings mostly on cervical MRI; Intensity: Now-4." (Doc. 72, at ¶ 14); (Doc. 72-1, at 14); (Doc. 81, at ¶ 14).

### B. INCARCERATION AT PIKE COUNTY CORRECTIONAL FACILITY

Cowher began his incarceration at the Pike County Correctional Facility on May 23, 2016, with an expected end date of August 4, 2016. (Doc. 72, at ¶¶ 16-17). Cowher first presented to the PrimeCare Medical Defendants at the Correctional Facility on May 23, 2016 and received medical care from them through November 17, 2016. (Doc. 72, at ¶ 19). At Cowher's intake screening evaluation, LPN Melissa Erickson noted Cowher walked with a cane, was taking a few medications at the time, and stated a medical history which included cervical stenosis of spinal canal and disc herniation C4-C7. (Doc. 72, at ¶ 20). She assigned Cowher a bottom bunk and allowed him to retain his cane and neck brace. (Doc. 72, at ¶ 20).

4

At his intake evaluation, Cowher stated he had not taken any of his medications since May 20, 2016 because he did not want to be medicated during his trial. (Doc. 72, at ¶ 22).

PrimeCare verified Cowher's prescriptions with his outside medical providers, who ordered that: Cowher's course of Flexeril be completed by May 24, 2016; his course of Neurontin be completed by May 29, 2016; and his course of Prednisone taper be completed by June 16, 2016. (Doc. 72, at ¶ 24). On May 24, 2016, Dr. Wloczewski of PrimeCare met with Cowher and noted mild distortion with C6-C7 of the spinal cord, C4-C5 stenosis, and that a neurosurgery office appointment was scheduled for June 21, 2016. (Doc. 72, at ¶ 30). Dr. Wloczewski issued orders for Cyclobenzaprine (aka Flexeril), Nortriptyline rather than Gabapentin (aka Neurontin), and the Prednisone taper. (Doc. 72, at ¶ 31). The neurosurgery office appointment was moved to May 31, 2016; however, Cowher did not attend this appointment. (Doc. 72, at ¶¶ 33, 40).

Cowher's next neurosurgery appointment was scheduled to take place on July 19, 2016. (Doc. 72, at ¶ 46). However, on June 7, 2016, PrimeCare did not approve the July 19th surgery because workers' compensation would not pay for the surgery while Cowher was incarcerated. (Doc. 72, at ¶ 48). On June 9, 2016, PA-C Andrew McMaster evaluated Cowher for his complaint of pain. (Doc. 72, at ¶ 49). PA McMaster discontinued Robaxin and added Flexeril, but otherwise continued with Cowher's previously prescribed medication. (Doc. 72, at ¶ 49). On June 16, 2016, PrimeCare increased Cowher's dosage of Flexeril from 5 mg to 10 mg, in light of Cowher's muscle spasms. (Doc. 72, at ¶ 55). On June 28, 2016, Dr. Wloczewski evaluated Cowher and assessed that he had chronic pain, thereby increasing Cowher's dosage of Nortriptyline for nerve pain from one capsule at bedtime to two. (Doc. 72, at ¶¶ 59-60). The following day Cowher underwent X-rays for his right hip and pelvis,

which showed Cowher had a normal right hip, and a "normal limited pelvis." (Doc. 72, at ¶ 61).

On July 12, 2016, PrimeCare approved Cowher's July 19th neurosurgery appointment, but again noted that the workers' compensation carrier continued to refuse to pay for the appointment while he was incarcerated. (Doc. 72, at ¶ 64). On July 19th, Dr. Rajjoub, of Lycoming Neurological Associates, reviewed three of Cowher's previous MRIs and noted a variety of ailments. (Doc. 72, at ¶ 65). Dr. Rajjoub documented the following treatment plan:

> Discussed the findings with Mr. Cowher at length. Explained surgery and alternatives. Explained non-surgical treatment and risks including doing nothing. Explained risks such as infection, numbness, pain, paralysis, weakness, hoarse voice, swallowing difficulty, pain, blood loss, CSF leak, non-union of fusion, instability, vocal cord paralysis or voice change, etc. He indicated understanding and wishes to proceed with surgery. Please call to arrange for anterior cervical diskectomy C6-7 with allograft bone and instrumentation. B proteins are not used in this procedure.

(Doc. 72, at ¶ 66).

Dr. Rajjoub's evaluation did not recommend Cowher undergo lumbar back, knee, or hip surgery of any kind, but noted that an anterior cervical diskectomy C4-5 and C6-7 with allograft bone and instrumentation should be arranged. (Doc. 72, at ¶ 68; Doc. 81, at ¶ 66). On July 19, 2016, LPN Kimberly Montauredes documented that "[p]atient is recommended to have cervical diskectomy with fusion – will have HSA call office to schedule." (Doc. 72, at ¶ 70).[2]

---

[2] Cowher disputes the date this note was made, asserting the note "appears to have been made between May 23, 2016 and June 14, 2016." (Doc. 81, at ¶ 70).

As of July 21, 2016, Cowher was scheduled for cervical surgery to occur at Williamsport Hospital on September 2, 2016. (Doc. 72, at ¶ 71). On July 26, 2016, PrimeCare noted "Corporate will NOT pay for surgery. If Pt. wants it he must pay on his own." (Doc. 81, at ¶ 72). In late July, PrimeCare made orders for certain prescription medications on Cowher's behalf. (Doc. 72, at ¶¶ 74, 77, 78). On August 7, 2016, LPN Kimberly Montauredes evaluated Cowher with respect to his complaints that his musculoskeletal pain was not relieved by his current medications. (Doc. 72, at ¶ 81). However, Cowher was to continue with the medication regimen until such time as he could be further evaluated by a medical provider. (Doc. 72, at ¶ 81).

On August 11, 2016, the Honorable Gregory H. Chelak sentenced Cowher to a period of incarceration, to be served in State Correctional Institutions, where PrimeCare would no longer be responsible for providing Cowher's medical care. (Doc. 72, at ¶ 82). On September 1, 2016, HSA Kendle Jeminola completed a Transfer of Health Information, noting Cowher's chronic and acute health problems. (Doc. 72, at ¶ 84).

On September 12, 2016, LPN Erickson evaluated Cowher and assessed him with back pain and referred him to a provider. (Doc. 72 at, ¶ 86). On September 20, Dr. Wloczewski evaluated Plaintiff's right hand and assessed Plaintiff as possibly having Raynaud's disease and ordered a trial of Norvac. (Doc. 72, at ¶ 89). On October 6, 2016, Paulina Foley, PA-C re-evaluated Plaintiff's right hand because he reported that the trial of Norvac was ineffective. (Doc. 72, at ¶ 95). On October 18, 2016, Cowher underwent the pre-operative consultation with Dr. Rajjoub. (Doc. 72, at ¶ 99). Dr. Rajjoub noted Cowher's diagnosis of Raynaud's disease and documented the ongoing pain in his cervical spine, shoulder and/or arm, and right hip, as well as numbness and/or tingling to his low back. (Doc. 72, at 99). Pre-admission

testing and surgical instructions were provided. (Doc. 72, at ¶ 99). Dr. Rajjoub's notes from October 18, 2016 specifically include:

> Discussed the findings with Mr. Cowher at length. Explained surgery and alternatives. Explained non-surgical treatment and risks including doing nothing. Explained risks such as infection, numbness, pain, paralysis, weakness, hoarse voice, swallowing difficulty, pain, blood loss, CSF leak, non-union of fusion, instability, vocal cord paralysis or voice change, etc. He indicated understanding and wishes to proceed with surgery. Please call to arrange for anterior cervical diskectomy C4-5 and C6-7 with allograft bone and instrumentation. B proteins are not used in this procedure.

> (Doc. 72, at ¶ 101).

Dr. Rajjoub did not recommend that Plaintiff undergo any further lumbar back or hip treatment (including, but not limited to surgery, as a result of this office appointment.) (Doc. 72, at ¶ 104).

On October 19, 2016, Cowher received a Release of Financial Responsibility, which outlined that the surgery he requested was *either elective or cosmetic in nature.* (Doc. 72, at ¶ 105) (emphasis added). PrimeCare is not required to provide elective or cosmetic surgeries. (Doc. 72, at ¶ 105). Cowher would need to assume personal financial responsibility for such procedures. (Doc. 72, at ¶ 105). Specifically, the Release states "I understand that PrimeCare Medical, Inc. will schedule the treatment but is not responsible for payment." (Doc. 72-5, at 42). Cowher refused to sign the document; however, it was signed by HSA Jeminola and another staff witness. (Doc. 72, at ¶ 105); (Doc. 72-5, at 42); (Doc. 82, at ¶ 105). Cowher testified in his deposition that he never saw this document because a "Nurse Bill" covered the form and told him that he would not get the surgery if he did not release PrimeCare for any liability. (Doc. 81, at ¶ 106). On October 20, Cowher told PA Pauline Foley that the neurosurgeon found his symptoms were caused by a cervical spine issue, not Raynaud's

disease. (Doc. 72, at ¶ 107). PrimeCare documented that Cowher's cervical spine surgery would occur on January 4, 2017, as that was the first available date. (Doc. 72, at ¶ 108).

On November 3, 2016, PA Foley evaluated Cowher and offered an increase in his pain medications, an additional x-ray (the earlier hip x-ray was normal), and crutches. (Doc. 72, at ¶ 119). According to the notes, Cowher "was not happy with this response" and declined the offer of crutches in favor of a cane. (Doc. 72, at ¶ 119). PA Foley prescribed Ultram and ordered a pelvic x-ray to be taken the next day. (Doc. 72, at ¶ 119). On November 4, 2016, right hip and pelvis X-rays revealed no fracture, dislocation, or abnormalities. (Doc. 72, at ¶ 121). The following afternoon LPN Tara Donaghy observed Cowher walking without his cane during medication pass. (Doc. 72, at ¶ 122). On November 16 or 17, 2016, PrimeCare shared the results of the November 4th X-rays with Cowher. (Doc. 72, at ¶ 144). On November 17, 2016, HAS Jeminola spoke to personnel at SCI Graterford to arrange Cowher's transfer to that facility, where PrimeCare would no longer provide healthcare to Cowher. (Doc. 72, at ¶¶ 130; 132). During this conversation, HAS Jeminola noted Cowher's surgery was scheduled for January 4, 2017. (Doc. 72, at ¶ 130).

C. INCARCERATION WITH THE DEPARTMENT OF CORRECTIONS

### 1. SCI Graterford

Cowher was transferred to SCI Graterford, and to the care of Correct Care, on November 17, 2016. (Doc. 72 at ¶¶ 18, 132); (Doc. 73, at 7). Cowher's medical history included constipation, right hip issues, hypertension, acid reflux, and chronic pain. (Doc. 77, at ¶ 33). Cowher reported additional medical history, notably a history of C4-C7 stenosis. (Doc. 77, at ¶ 33). RN Link noted a current diagnosis of "C6-7 disc distortion with cord involvement, C4-5 stenosis." (Doc. 77, at ¶ 33). Cowher was placed in the infirmary for a

twenty-three-hour observational period, due to his ambulatory dysfunction and C-spine herniations. (Doc. 77, at ¶ 33).

On November 18, 2016, Dr. David Edwards monitored Cowher in the infirmary. (Doc. 77, at ¶ 35). Dr. Edwards noted a history of ambulatory dysfunction, a hip problem, and C-spine herniation. (Doc. 77, at ¶ 35). Dr. Edwards planned to change Cowher's housing from the infirmary to the general prison population. (Doc. 77, at ¶ 35). On November 29, 2016, nursing staff at SCI-Graterford noted that Cowher was to be directly transferred to the infirmary at SCI-Camp Hill due to his continued ambulatory dysfunction. (Doc. 76-1, at 127; Doc. 77, at ¶ 35).

### 2. SCI Camp Hill

On November 30, 2016, Cowher was transferred to SCI Camp Hill. (Doc. 77, at ¶¶ 37-38). Upon his transfer to SCI Camp Hill, Cowher signed a receipt for an inmate handbook and administrative directives. (Doc. 77, ¶ 39). Medical staff noted acute conditions of: C4-7 herniated discs, lumbar bulging discs, spinal stenosis, mild distortion spinal cord, numbness right lower extremity, right meniscus tear, degenerative disc disease. (Doc. 77, at ¶ 38). Medical staff also noted Cowher's appendectomy, partial amputation of left hand with repair, and left lower extremity shrapnel injury. (Doc. 77, at ¶ 38). The staff continued Cowher's prescribed medications – Flexeril, Colace, Naproxen, Pamelor, and Zantac. (Doc. 77, at ¶ 38).

PA Okurowski noted that Mr. Cowher would be admitted to infirmary for 23-hour observation to document gait/ambulatory baseline. (Doc. 77, at ¶ 40). During Cowher's stay in the infirmary, Cowher reported to Nurse Henderson that he was "doing well," although he complained of herniated discs in his neck as well as right hip pain and shoulder pain. (Doc.

77, at ¶ 41). On December 2, 2016, Cowher complained to nursing staff of right shoulder pain, as well as back and neck pain; staff reviewed his MRI records and noted herniations and bulging discs at several levels. (Doc. 77, at ¶ 42). Cowher was discharged from the infirmary to the block and permitted to use a cane and a wheelchair. (Doc. 77, at ¶ 42). Cowher again presented to sick call on December 5, 2016, when he asked for a cervical collar to wear at night to prevent spasm in his neck and arm. (Doc. 77, at ¶ 43). PA Bates ordered the collar and Cowher received it the same day. (Doc. 77, at ¶ 43). Cowher returned to sick call on December 7, 2016, when he requested a medical mattress. (Doc. 77, at ¶ 44). CRNP Peace wrote an order for the mattress. (Doc. 77, at ¶ 44).

On December 20, 2016, Dr. Voorstaad evaluated Cowher in the MD line, noting a herniation of Cowher's cervical spine. (Doc. 77, at ¶ 48). Cowher reported that he saw neurosurgeon while at county who wanted to do surgery, but that he was since transferred into the DOC and the surgery had yet to take place. (Doc. 77, at ¶ 48). On December 29, 2016, Cowher returned to the MD line to follow up regarding his chronic pain related to cervical disc disease and herniation. (Doc. 77, at ¶ 50). Dr. Voorstaad continued Cymbalta, discontinued Nortriptyline, and was unable to renew Flexeril. (Doc. 77, at ¶ 50).

### 3. SCI Mahanoy

Cowher was transferred to SCI Mahanoy on January 11, 2017, and his Intra-System Transfer Reception Screening form was completed that same day. (Doc. 77, at ¶¶ 51-52). The screening form noted Cowher's chronic conditions and problems, including his cervical disorder not otherwise specified, pain/neuropathy (right sided), gastroesophageal reflux disease (GERD), and constipation. (Doc. 77, at ¶ 52). The screening form also noted his medical history, including previous surgeries, and his then-present medications, including

Cymbalta and Zantac. (Doc. 77, at ¶ 52). The form also noted that Cowher was limited to bottom bunk/bottom tier due to a mobility impairment, was not able to engage in weight lifting, was limited to passive sports, and used physical aids, including a cane, a wheelchair for distance, and both hard and soft cervical collars. (Doc. 77, at ¶ 52).

On January 16, 2017, Cowher met with PA Miller and reported that he was supposed to have cervical disc surgery while at SCI Camp Hill. (Doc. 77, at ¶ 53). Cowher stated that he had all his MRI records in his cell. (Doc. 77, at ¶ 53). Cowher brought his hospital records to sick call on January 18, 2017, and reported that he needed surgery. (Doc. 77, at ¶ 54). Cowher also relayed that he was supposed to get the surgery but "was shipped" to SCI Mahanoy instead. (Doc. 77, at ¶ 54). PA Palmigiano explained to Cowher that she was not sure if the MRI reports that he had in his possession could be accepted into his medical chart. (Doc. 77, at ¶ 54). Cowher was prescribed Flexeril, Pamelor, and Naprosyn. (Doc. 77, at ¶ 54). Cowher provided copies of his MRIs to the medical department on January 20, 2017, and these copies were placed into his medical chart. (Doc. 77, at ¶ 55).

On January 31, 2017, PA Palmigiano scheduled Cowher on the MD line regarding pain management and to discuss an MRI of his spine. (Doc. 77, at ¶ 58). On February 8, 2017, Dr. Rodgers reviewed Cowher's prior MRIs with him, noting cervical issues, including herniated discs. (Doc. 77, at ¶ 59). Cowher reported intermittent pain shooting down his right arm and back. (Doc. 77, at ¶ 59). Cowher also reported that prior to his incarceration, and while in the county system, he was seen by neurosurgery twice, and that surgery on his C-spine was recommended. (Doc. 77, at ¶ 59). Some of the paperwork reviewed by Dr. Rodgers indicated Cowher had significant cervical issues. (Doc. 83, at ¶ 4).

Dr. Rodgers wrote an order to obtain Cowher's visit notes and recommendations from his previously seen neurosurgeon, Dr. Rajjoub, of Lycoming Neurosurgical Associates. (Doc. 77, at ¶ 59). Dr. Rogers testified that even if an inmate arrives with a pre-existing scheduled surgery, and provides supporting medical records such as MRI reports, Correct Care must still secure copies of the records from the original providers as needed to complete the patient's medical chart. (Doc. 84, at ¶¶ 2, 10-11).

Dr. Rodgers again evaluated Cowher in the MD line on March 1, 2017. (Doc. 77, at ¶ 62). At this time none of Cowher's outside medical records had been obtained, but Dr. Rodgers told Cowher that he would put in another request. (Doc. 77, at ¶ 62). Cowher stated that Pamelor seemed to be working pretty good for his pain. (Doc. 77, at ¶ 62). Dr. Rodgers noted that, while Cowher was wheelchair bound, he was oriented and in no acute distress. (Doc. 77, at ¶ 62). Dr. Rodgers' assessment included C-spine degenerative disc disease with neuropathy. (Doc. 77, at ¶ 62).

On April 21, 2017, Cowher stated to PA Miller that he needed a temporary medication refill due to neck and back pain. (Doc. 77, at ¶ 73). Cowher presented in his wheelchair, but PA Miller noted Cowher was alert and in no distress. (Doc. 77, at ¶ 73). PA Miller noted that the medications were refilled. (Doc. 77, at ¶ 73).

Cowher was subsequently released from DOC custody on July 6, 2017. (Doc. 77, at ¶ 84).

D. GRIEVANCE HISTORY

Cowher filed a number of grievances while in DOC Custody – three of which relate to his claims in this case, and none of which were properly exhausted. On March 28, 2017, while incarcerated at SCI Mahanoy, Cowher commenced grievance number 670733. Therein,

13

Cowher grieved the pace of scheduling his neck surgery, the treatment provided for his knee and back, and the denial of certain medical prescriptions. (Doc. 76-2, at 8). Prison staff denied grievance number 670733 on initial review. (Doc. 76-2, at 6). Cowher's response was due on April 8, 2017, but he did not file an appeal. (Doc. 76-2, at 7; Doc. 77, at ¶ 69).

On April 13, 2017, Cowher commenced grievance number 673492, which pertained to his appointments for neurology and physical therapy. (Doc. 76-2, at 14). Prison staff denied the grievance on initial review. (Doc. 76-2, at 12). Cowher appealed this denial to the facility manager on April 26, 2017, who denied Cowher's appeal on May 11, 2017. (Doc. 76-2, at 9-11). Cowher did not further appeal this grievance. (Doc. 77 at ¶ 79).

On April 20, 2017 Cowher commenced grievance number 674917, complaining that he needed prescribed medication, specifically Naprosyn, Zantac, and Rantidine [*sic*]. (Doc. 77, at ¶ 79). Prison staff denied Cowher's grievance on initial review. (Doc. 76-2, at 15). Although Cowher's response was due May 15, 2017, he did not appeal the denial of this grievance. (Doc. 76-2, at 16; Doc. 77, at ¶ 78).

Following his release from custody on July 6, 2017, personnel for the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") reported that Cowher had not filed anything with their office. (Doc. 77, at ¶ 87). Cowher does not dispute that he failed to appeal his grievances through Final Review with SOIGA. (Doc. 83, at ¶¶ 33-99).

E. Post-Incarceration Surgery

On November 18, 2017, after he was released from custody, Cowher had surgery for an anterior cervical discectomy and fusion (C4-7). (Doc. 72, at ¶ 138; Doc. 82, at 3). Dr. Michael Haak performed this surgery at Geisinger Medical Center. (Doc. 72, at ¶ 138; Doc.

82, at 3). On April 25, 2018, Dr. Haak also performed surgery on Cowher's lumbar spine. (Doc. 72, at ¶¶ 144, 146).

## II. **DISCUSSION**

### A. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,*

477 U.S. at 249.

Finally, "although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'" *Velentzas v. U.S.*, No. 4: CV -07-1255, 2010 WL 3896192, at *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x. 868, 868 (3d. Cir. 2007) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Velentzas*, 2010 WL 3896192, at *7. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007).

B. Exhaustion of Claims Against Correct Care

In moving for summary judgment, Correct Care asserts Cowher failed to exhaust his administrative remedies with respect to all of the claims he asserts in this action. (Doc. 76, at 5).[3] In response, Cowher contends that the grievances he filed put Correct Care on "notice of

---

[3] The PrimeCare Defendants do not move for summary judgment on the basis of failure to exhaust administrative remedies. As such, the Court only examines whether Cowher exhausted his administrative remedies as to his claims against Correct Care. As discussed *infra*, Cowher's claims against Correct Care did not accrue until after he initiated this lawsuit, after he was transferred into DOC custody, and after Correct Care assumed his treatment during his incarceration with the DOC.

[his] complaint." (Doc. 84, at 4). Cowher argues that he satisfied the Prison Litigation Reform Act's ("PLRA") exhaustion requirement because the purpose of exhaustion "is to provide notice of the prisoner's grievances and a chance for the prison system to address them."(Doc. 84, at 4). In support of this argument, Cowher relies solely on two non-binding cases from the Fourth and Fifth Circuits. (Doc. 84, at 4).

The PLRA mandates that prisoners exhaust all available administrative remedies prior to initiating a suit under § 1983 for the deprivation of Constitutional rights. 42 U.S.C. § 1997e(a). As the statutory language makes clear, § 1997e(a) applies equally to § 1983 actions, which involve state actors, and to *Bivens*[4] actions, which involve federal actors. *Nyhuis v. Reno*, 204 F.3d 65, 68 (3d Cir. 2000); *see also Dillon v. Rogers*, 596 F. 3d 260, 272-73 (3d Cir. 2010) (noting that exhaustion under the PLRA is a threshold issue, and that "the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed to the merits."). "[T]he PLRA amended § 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory—whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action." *Nyhuis*, 204 F. 3d at 67; *see also Spruill v. Gillis*, 372 F.3d 218, 227 (3d Cir. 2004). Even where the relief sought is unavailable through administrative remedies, prisoners must pursue their claims through prison channels prior to commencing related litigation in federal courts. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

---

[4] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Further, inmates must see their grievances through to the final level of review possible under the administrative review system in place. *Woodford*, 548 U.S. at 93. Compliance with the prison's internal grievance system, as opposed to rules defined by the PLRA itself, is needed to satisfy the PLRA's exhaustion requirement. *See Small v. Camden Cnty.*, 728 F.3d 265, 272 (3d Cir. 2013); *Moore v. Lamas*, NO. 3:12-CV-223, 2017 WL 4180378, at *6 (M.D. Pa. Sept. 21, 2017). Claims not made within the parameters set forth by the prisons, and therefore not reviewed on the merits, are considered procedurally defaulted, precluding courts from considering those claims. *See Spruill*, 372 F.3d at 227-32.

Courts may take "judicial notice of the Pennsylvania Department of Corrections' (DOC) policy statement, DC–ADM 804, captioned Inmate Grievance System." *See Ali v. Superintendent SCI Camp Hill*, No. 1:CV-14-1851, 2015 WL 5913197, at *3 (M.D. Pa. Oct. 7, 2015) (internal citations omitted). The Inmate Grievance System ("IGS") requires a concern about prison life to be filed initially with the Facility Grievance Coordinator. DC-ADM 804 § 1(A)(5). If the inmate receives an unfavorable response to his initial filing, he must appeal within fifteen working days to the Facility Manager. DC-ADM 804, §2(A)(1)(a-b). If the inmate receives an unfavorable response from the Facility Manager's review, he must appeal within fifteen working days to the Final Review. DC-ADM 804, § 2(B)(1)(b). A proper appeal to Final Review must include a written appeal to the SOIGA. DC-ADM 804 § 2(B)(1)(j)(5).

A prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court. *Glaster v. Fed. BOP-Inmate Designation and Custody Classification Pers. / Officer*, No. 3:CV–08–0193, 2009 WL 2515787, at *2 (M.D. Pa. Aug. 13, 2009) (quoting *Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (not precedential)). "Under the [PLRA], prisoners may file supplemental

complaints if the claims in question 1) have truly accrued since the beginning of the suit and 2) are exhausted per 42 U.S.C. § 1997e(a) before the supplement is filed." *Moneyham v. Potter*, NO. 3:15-cv-00436, 2017 WL 4079543, at *4 (M.D. Pa. Aug. 3, 2017) (emphasis omitted) (*report and recommendation adopted* 2017 WL 4073794 (M.D. Pa. Sept. 14, 2017) (quoting *Boone v. Nose*, 530 F. App'x 112, 113 n.1 (3d Cir. 2013) (per curiam)). Finally, transfer to another facility does not excuse the PLRA's exhaustion requirement. *Ball v. Bower*, No. 1:10–CV–2561, 2011 WL 6782621, *5 (M.D. Pa. Oct. 13, 2011) (*report and recommendation adopted* 2011 WL 6782428, Dec. 21, 2011) (citing *Williamson v. Wexford Health Sources, Inc.,* 131 F. App'x 888, 890 (3d Cir.2005)).

Here, Cowher filed the initial complaint in this matter on November 10, 2016. (Doc. 1). At that time, Cowher was incarcerated at Pike County Correctional Facility, and Prime Care provided his medical care. (Doc. 72, at ¶ 132). Cowher's prison transfer, which occurred in the interim between his filing of the initial complaint and his filing of the operative complaint, resulted in a change of his medical care provider from Prime Care to Correct Care. (Doc. 72, at ¶ 132); (Doc. 73, at 7); (Doc. 77, at ¶ 2). Correct Care did not provide any allegedly constitutionally deficient care to Cowher until after he filed the initial complaint. Cowher filed an amended complaint, the operative complaint in the instant action, on June 27, 2017. (Doc. 29). At that time, Cowher was incarcerated at SCI-Mahanoy, and Correct Care provided his medical care. (Doc. 77, at ¶ 2). Cowher named Correct Care as a Defendant for the first time in that amended complaint. (Doc. 29, at ¶ 20). Thus, in order for the Court to consider Cowher's claim of deliberate indifference against Correct Care, first asserted in the amended complaint, his claim must 1) have accrued since the filing of his initial complaint and 2) be properly exhausted. *See Moneyham*, 2017 WL 4079543, at *4 (citing *Boone*, 530 F.

App'x at 113 n.1). A deliberate indifference claim accrues "when a plaintiff knows or has reason to know of the injury which is the basis of the action." *Monroe v. Hogsten*, 2009 WL 1138123, at *4-5 (M.D. Pa. Apr. 27, 2009) (citing *Gentry v. Resolution Trust Corp.,* 937 F.2d 899, 919 (3d Cir. 1991)). Based on the above, Cowher's additional deliberate indifference claim against Correct Care would not have accrued until after he filed the initial complaint in this matter. *See Monroe*, 2009 WL 1138123, at *4-5 (citing *Gentry*, 937 F.2d at 919).

District courts must determine whether any of the claims in a suit are unexhausted, then dismiss those claims from the suit and proceed only with those claims which are exhausted. *See Jones v. Bock*, 549 U.S. 199, 223-24 (2007) (holding no total exhaustion rule for PLRA suits). Each grievance that relates to each distinct incident forming the basis of a complaint must be exhausted. *See also Small v. Camden Cty.,* 728 F.3d 265 , 268 (3d Cir. 2013) (approving district court's process of determining whether plaintiff "properly filed a grievance and thereafter exhausted each of the fourteen incidents of which he complained"); *see also Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 465 (M.D. Pa. 2010) (consolidating two actions then requiring prisoner-plaintiff to file amended complaint because exhaustion must be complete at the time of filing an amended complaint).

Thus, at issue is whether Cowher properly exhausted his claim against Correct Care once it accrued. Proper exhaustion of Cowher's claims against Correct Care requires him to appeal unfavorable grievances to SOIGA in writing. *See Small*, 728 F.3d at  272; DC-ADM 804 § 2. Here, Cowher filed three grievances concerning Correct Care's provision of medical care regarding his back or shoulder pain while in DOC Custody.

Cowher failed to appeal the initial denial of two of these grievances, numbers 670733 and 674917, to the Facility Manager. (Doc. 77, at ¶ 69); (Doc. 77, at ¶ 78). Notably, the

deadlines for Cowher to complete an appeal (April 8, 2017, as to grievance number 670733, and May 15, 2017, as to grievance number 674917) passed before Cowher filed the amended complaint in this matter. (Doc. 76-2, at 7; Doc. 76-2, at 16). Thus, it is evidence that Cowher did not exhaust his administrative remedies as to these two grievances. Cowher, however, did appeal the third grievance, number 673492, to the Facility Manager. (Doc. 76-2, at 10-11). However, after receiving the Facility Manager's denial of his grievance, Cowher did not appeal this grievance to Final Review. (Doc. 77 at ¶ 79). The Facility Manager's denial is dated May 11, 2017, and Cowher would have had fifteen working days to appeal to final review from the date he received this denial. (Doc. 76-2, at 9). While the record does not disclose when Cowher received this denial, he does not dispute that he failed to timely appeal any of his grievances to Final Review. (Doc. 76-2, at 8, 14, 17). Therefore, Cowher's claims against Correct Care are procedurally defaulted.

### C. Cowher's Eighth Amendment Deliberate Indifference Claims

Cowher submits that Defendants were deliberately indifferent to his serious medical needs in not scheduling his cervical spine surgery, and in their decisions about his medication. With regard to PrimeCare, Cowher submits that PrimeCare was deliberately indifferent to his serious medical need by delaying and changing his medications, and postponing the surgery due to "bureaucracy and an unwillingness to assume financial responsibility" for the surgery. (Doc. 82, at 7). As to Correct Care, Cowher argues that Correct Care displayed deliberate indifference to his serious medical need by not scheduling surgery that was previously scheduled by other providers, and instead chose "to engage its bureaucracy." (Doc. 84, at 5).

To establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference

21

to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Lanzaro*, 834 F.2d at 347 (citations omitted). A serious medical need exists if failure to treat such condition would constitute a "denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 824, 825 (1994).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). However, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). Mere negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to

establish deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004); *Lanzaro*, 834 F.2d at 346. Further, a prison doctor's failure to perform additional diagnostic tests does not constitute cruel and unusual punishment. *See Estelle*, 429 U.S. at 107. The key question is whether the defendant has provided the inmate with some type of treatment, regardless of whether it is what the inmate desires. *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. Feb. 29, 1988); *see, e.g., Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

The deliberate indifference prong of an adequacy of care claim in particular contains both an objective component, the "adequacy of the medical care[,]" and a subjective component, the "individual defendant's state of mind." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017). "[A] plaintiff must set forth evidence of an objectively serious medical need. A medical need qualifies as serious … if… it is one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Young v. Kazmerski*, 266 F. App'x 191, 193 (3d Cir. 2008) (citing *Lanzaro,* 834 F.2d at 346-47) (quotations omitted). Here, there is no real dispute by the parties as to the seriousness of Cowher's medical need. Rather, the lies in whether or not either set of defendants were deliberately indifferent to that need.

Where, as here, "a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017); *accord United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("[w]here a prisoner has received some medical attention and the dispute is over the

adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). "When medical care is provided, [courts] presume that the treatment of a prisoner is proper *absent evidence* that it violates professional standards of care." *Pearson*, 850 F.3d at 535 (emphasis added); *accord Brown v. Borough of Chambersburg*, 903 F.2d 274. 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *Lanzaro*, 834 F.2d at 346 ("[M]ere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation."); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("[T]he propriety or adequacy of a particular course of treatment … remains a question of sound professional judgment."). Neither a prisoner's personal, subjective dissatisfaction with the care he has been provided, nor his disagreement with the professional judgment of trained medical staff, in and of itself, is sufficient to establish deliberate indifference. *See Hairston v. Director Bureau of Prisons*, 563 F. App'x. 893. 895 (3d Cir. 2014); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990): *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

There are, however, "circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. For example, prison officials "cannot deny reasonable requests for medical treatment … [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury." *Palakovic*, 854 F.3d at 228 (citations and internal quotations omitted). Likewise, "knowledge of the need for medical care may not be accompanied by the intentional refusal to provide that care." *Palakovic*, 854 F.3d at 228. The court should also consider the effect of denying medical treatment under any particular circumstances, including where such denial or delay results in

unnecessary and wanton infliction of pain, or causes an inmate to suffer a life-long handicap or permanent loss, or render a condition irreparable. *Banks v. Beard*, No. 2:03CV659, 2006 WL 2192015, at *13 (W.D. Pa. Aug. 1, 2006). Outside of such situations, each claim must be evaluated to determine whether the treatment or lack thereof implicates the "broad and idealistic concepts of dignity, civilized standards, humanity and decency" that provide the underpinnings for defining the reaches of the Eight Amendment. *Banks,* 2006 WL 2192015, at *13 (quoting *Estelle v. Gamble,* 429 U.S. 97, 102 (1976)).

Both PrimeCare and Correct Care submit that they are entitled to summary judgment in part because Cowher has not produced expert medical testimony in support of his claim. (Doc. 73, at 14, 16; Doc. 78, at 28-29). In response, Cowher avers that PrimeCare's changing of his medication, and the fact that it ultimately approved his surgery, is extrinsic evidence precluding summary judgment on his Eighth Amendment claim against PrimeCare. (Doc. 82, at 8). Cowher further submits that the fact that surgery was already scheduled when he arrived in state custody is extrinsic evidence precluding summary judgment in favor of Correct Care. (Doc. 84, at 5).

### 1. Delays and Changes to Cowher's Medication

As to Cowher's claims related to delays and changes in his pain medication, the Court finds that the undisputed evidence in the record does not amount to deliberate indifference under the Eighth Amendment. "[S]poradic delays (not exceeding four days at any one time) in providing prescription medication … do not amount to deliberate indifference." *Ayala v. Terhune*, 195 F. App'x 87, 91 (3d Cir. 2006). Here, Cowher testified that he thinks he went four or five days without pain medication "a couple times." (Doc. 81, at ¶¶ 3-17). Cowher going four or five days without medication is insufficient to survive summary judgment. *See*

*Ayala*, 195 F. App'x at 91. Furthermore, Cowher's allegations that sometimes his medication was mixed up, or that he was given the wrong dosage, are insufficient to show that the named defendants acted with a culpable state of mind. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Thus, Cowher's deliberate indifference claim related to the administering of his medications does not survive summary judgment. *See also Hartman v. Corr. Med. Serv.*, 366 F. App'x 453, 455 (3d Cir. 2010) (dismissing plaintiff's complaint as not based on an Eighth Amendment deliberate indifference theory when "his allegations reflect his frustrations with repeated occurrences of medication lapses, as well as his disagreement with the manner in which defendant… directed that all of [plaintiff]'s medications be administered by medical staff"). Accordingly, the motions for summary judgment by PrimeCare and Correct Care are GRANTED on this ground.

### 2. Delay and Denial of Surgery

Cowher's deliberate indifference claim related to the delay or denial of surgery also fails. In evaluating deliberate indifference in an adequacy of care claim, as Cowher brings here, medical expert testimony may be necessary to establish deliberate indifference where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017); *see also Jackson v. Ivens*, 565 F. App'x 115, 118 (3d Cir. 2014) (citing *Montgomery v. Pinchak*, 294 F.3d 492, 504 (3d Cir. 2002) ("[w]hile the parties do not dispute that sarcoidosis is a serious medical issue, the necessary treatment for sarcoidosis is not obvious to a lay person")); *Capozzi v. Pigos*, 640 F. App'x 142, 144 (3d Cir. 2016) (upholding district court's grant of summary judgment when prisoner-plaintiff's eighth amendment claim "involve[d], at bottom, a dispute with his doctors over whether surgery [was] currently

appropriate"); *Mitchell v. Gershen*, 466 F. App'x 84, 87 (3d Cir. 2011) ("[I]n order to sustain his deliberate indifference claim based on his objection to the type of diagnosis and treatment he received, [plaintiff] needs … expert testimony because the ability to diagnose a foot infection and determine the proper treatment and medication protocol is not readily apparent to lay persons."). Evaluating whether medical treatment is adequate presents an objective question typically beyond the competence of a non-medical professional, and this requires a prisoner to offer extrinsic proof regarding the quality of medical care to defeat the presumption that the medical care provided to him or her was adequate. *Gershen*, 466 F. App'x at 87; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."). Nonetheless, expert testimony may not be required where other forms of extrinsic evidence may suffice. *Pearson,* 850 F.3d at 536; *Brighthwell v. Lehman*, 637 F.3d 187, 194 n.8 (3d Cir. 2011). Extrinsic proof of the quality of medical care may include a training manual, photograph, or medical records. *Pearson,* 850 F.3d at 536.

Cowher submits that PrimeCare's decision to approve the surgery only after it decided to pay for it is evidence of deliberate indifference. (Doc. 82, at 8). The denial of medical care, when based on non-medical factors such as cost, may violate the Eighth Amendment. *See Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). However, "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Winslow v. Prison Health Serv.*, 406 F. App'x 671, 674 (3d Cir. 2011) (citing *Reynolds v. Wagner,* 128 F.3d 166, 175 (3d

Cir. 1997).[5] Here, the record contains some evidence that PrimeCare considered cost in deciding not to provide Cowher's surgery. (Doc. 72-4, at 17); (Doc. 72-5, at 42). PrimeCare's "release of financial responsibility" states that PrimeCare will not pay for surgery which is *elective or cosmetic in nature*. (Doc. 72-5, at 42). However, Cowher testified that cost was never brought up regarding PrimeCare's decision not to pay for the surgery. (Doc. 72, at ¶ 106; Doc. 81, at ¶ 106).

In response to Correct Care's motion for summary judgment, Cowher submits that "Correct Care chose instead to engage its bureaucracy rather than secure the surgery that everyone else said was warranted," including requesting an inmate's medical records through the DOC as opposed to ordering treatment based on the inmate's "obvious needs." (Doc. 84, at 5, 7). Cowher also argues that Correct Care was deliberately indifferent to his serious medical need by waiting to secure medical records, as opposed to relying on a pre-scheduled surgery. (Doc. 83, at ¶ 2; 10-11). The undisputed record, however, establishes that an order for medical records is processed through the DOC's Medical Records Department, not through Correct Care, and as such, Correct Care was not able to obtain Cowher's records from his incarceration at Pike County Correctional Facility, including his records with Dr. Rajjoub. (Doc. 76, at 35-37). Further, Correct Care submits that Cowher's condition was not

---

[5] The Court in *Winslow* upheld summary judgment for defendants responsible for providing prisoner-plaintiff's medical care despite "some record evidence suggesting that Defendants considered the cost of [plaintiff's] treatment" because "the record is equally clear that [defendants] did not focus exclusively or even predominantly on cost and that the treatment that they ordered was consistent with their professional judgment."

urgent such that "subvert[ing] the normal consultation process and order[ing] an emergency consultation" would have been warranted. (Doc. 76, at 37).

It is also undisputed from the record that Correct Care used various treatments to address Cowher's back and shoulder pain. For example, Cowher was provided a medical mattress at SCI Graterford. (Doc. 77, at ¶ 44). Cowher requested and received a cervical collar to prevent spasms in his neck and down his arm. (Doc. 77, at ¶ 43). When Cowher presented to SCI Mahanoy in January 2017, his physical aids included a cane, wheelchair for distance, and both hard and soft cervical collars. (Doc. 77, at ¶ 52). This record, undisputed by Cowher, demonstrates that DOC medical personal attended to his back and shoulder pain, and that Correct Care officials addressed Cowher's complaints of pain with medication throughout his incarceration with the DOC. (Doc. 77, at ¶ 49, ¶ 52, ¶ 54, ¶ 62, ¶ 73).

Both sets of Defendants produced expert reports that concluded the defendants were not deliberately indifferent to Cowher's serious medical needs. Specifically, PrimeCare produced expert testimony recounting the medications Cowher received, and its expert found that the treatment which Cowher received was "in concert with conservative care for spinal disc disease with radiculopathy." (Doc. 72, at ¶ 149). Notably, Cowher did not point to record evidence to dispute this testimony. (Doc. 81, at ¶¶ 148-152). Cowher's allegation that PrimeCare considered cost in deciding to deny him elective surgery, coupled with record evidence which shows the decision was consistent with professional judgment, is insufficient to create a disputed material fact on the subjective prong of this deliberate indifference claim. *See Winslow*, 406 F. App'x at 672, 675; *see also Fantone v. Herbik*, 528 F. App'x 123, 125-26; 126 n. 3 (3d Cir. 2013) (evidence which shows defendants reviewed MRI's and x-rays of prisoner-plaintiff's ailment, but did not refer him for elective surgery, does "not

demonstrate… the [defendants] had a sufficient[ly] "culpable state of mind"). The undisputed record evidence indicates Cowher twice consulted with Dr. Rajjoub while under PrimeCare's medical care, in July and October of 2016. (Doc. 72, at ¶¶ 66; 101; Doc. 81, ¶¶ 66, 99-104). On both occasions, Dr. Rajjoub discussed surgery and non-surgical alternatives, including doing nothing. (Doc. 72 at ¶¶ 66; 101). At the October appointment, although Cowher indicated that he wished to proceed with surgery, surgery was not the only recommendation made by Dr. Rajjoub. (Doc. 72-8, at 9). On neither occasion did Dr. Rajjoub state Cowher's current treatment plan was not effective, or that Cowher was not responding to it. *See Brown v. Deparlos*, 2011 WL 1158289, at *3, 5 (M.D. Pa. March 28, 2011); (Doc. 72-8, at 9, 16). Ultimately, medical personal at Pike County Correctional Facility determined Cowher's surgery was "elective" in nature. (Doc. 72, at ¶¶ 75, 105; Doc. 81 at ¶¶ 74-79, 105). Further, despite Cowher's assertion that Dr. Rajjoub did not discuss non-surgical alternatives, which led Cowher to believe that surgery was necessary, Cowher does not cite to any record evidence supporting this assertion. (Doc. 72-11, at 14). "Averments that are 'entirely unsupported by the record and directly contrary to … testimony,' or that are 'offered solely to defeat summary judgment,' may be disregarded." *Jugan v. Econ. Premier Assurance Co.*, 728 F. App'x 86, 91 (3d Cir. 2018) (quoting *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017)).

Cowher has not provided any extrinsic evidence to show the course of treatment was improper, and the course of treatment for a cervical spine and bulging disc issue would not be obvious to a lay person. *See Jackson v. Ivens*, 565 F. App'x 115, 118 (3d Cir. 2014). Moreover, where medical care is provided, the Court presumes the care to be adequate. *See Pearson v. Prison Health Serv.*, 850 F. 3d 526, 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)). PrimeCare may consider costs when denying elective surgery, so long as

the treatment PrimeCare provides is consistent with its sound medical judgment. *See Winslow,* 406 F. App'x at 672, 675. Thus, even assuming, *arguendo,* that Cowher created a triable issue regarding the objective prong of his deliberate indifference claim, Cowher has not created a genuine issue of material fact regarding the subjective prong of his deliberate indifference claim against PrimeCare. *See Fantone,* 528 F. App'x at 125-26; 126 n. 3; *Gershen,* 466 F. App'x at 87.

Correct Care also produced expert testimony regarding the adequacy of Cowher's care. According to expert testimony from Dr. Winer, "[i]n 75% of patients with [Cowher's] presentation, no surgery is every [*sic*] necessary, hence the first approach to care." (Doc. 72-9, at 2). Therefore, the only expert testimony regarding the adequacy of Correct Care's treatment reveals no disputed material fact regarding the adequacy of that treatment.   Even assuming the record contained evidence that the treatment was inadequate, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference" when there is no evidence that said treatment violated proper standards of care. *Pearson,* 850 F. 3d at 535 (*citing O'Carroll,* 991 F.2d at 69 n. 13; *Brown,* 903 F.2d at 278); *see also Serrano v. Folino,* 339 F. App'x 254, 256-57 (3rd Cir. 2009) (summary judgment warranted when record "indicates that [prisoner-plaintiff] received frequent medical attention, including an MRI, a recommendation that he receive physical therapy, and an assessment by a team of physicians, including an orthopedic specialist"   and prisoner-plaintiff's claim that "knee surgery was improperly withheld rests entirely on his allegation that [defendant physican] promised to recommend knee surgery and did not do so"). Further, although there may be a question of fact regarding the motives of the prison doctor responsible for delaying treatment when delay eliminates the possibility of that treatment's effectiveness, there is no dispute that the outcome of Cowher's

surgery was not affected by the delay. *Cf. O'Carroll*, 991 F.2d at 68-69 (finding question of fact regarding prison physician's intent precluded summary judgment on deliberate indifference claim when inmate suffered stroke pre-incarceration, repeatedly notified prison authorities of his deteriorating condition, prison physician sent plaintiff to a neurologist who "specifically recommended physical therapy," and it was "undisputed that physical therapy must take place within approximately eighteen months of a stroke to be effective,[and so] time was of the essence"). As such, even if Cowher had exhausted his administrative remedies against Correct Care, the record is devoid of any disputed material fact precluding summary judgment on the deliberate indifference claim against Correct Care.

For these reasons, summary judgment is GRANTED in favor of Prime Care and Correct Care as to Cowher's Eighth Amendment medical needs claim.

D. COWHER'S *MONELL* CLAIMS

PrimeCare and Correct Care seek summary judgment on Cowher's *Monell* claims. A claimant can seek to hold a municipality liable with respect to its constitutionally deficient customs or policies. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (citing *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 696 (1978)). "[A] municipality may be liable under section 1983 only if it can be shown that its employees violated a plaintiff's civil rights as a result of a municipal policy or practice." *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir. 1989) (internal citations omitted). Further, "private physicians or hospitals which provide medical services to inmates pursuant to a contract with the prison may be held liable in a civil rights suit." *Little v. Lycoming Cnty.*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *West v. Atkins,* 487 U.S. 42, 54 (1988)).

However, regardless of any policy or practice it may have adopted, a medical services contractor, such as PrimeCare or Correct Care, cannot be held vicariously liable under *Monell* unless one of the individual defendants "is primarily liable under section 1983 itself." *Williams*, 891 F.2d at 467; *see also City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (municipal liability requires an underlying constitutional violation). As discussed above, Cowher failed to exhaust his claims against Correct Care. Further, he has not created a genuine issue of material fact regarding his deliberate indifference claim against both PrimeCare and Correct Care. Accordingly, Cowher cannot maintain a *Monell* claim against PrimeCare or Correct Care, and summary judgment is entered in their favor. *See Heller*, 475 U.S. at 796.

 E. COWHER'S STATE LAW CLAIMS

Cowher's amended complaint asserts state law negligence and intentional infliction of emotional distress claims. (Doc. 29, at 15; 17). Where a district court has dismissed all claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Ordinarily, when all federal law claims have been dismissed and only state law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. Cohill, 484 U.S. at 350. Finding nothing in the record to distinguish this case from the ordinary one, the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See* Cohill, 484 U.S. at

350 n. 7. Therefore, Cowher's remaining state law claims will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

III.     **CONCLUSION**

Cowher failed to exhaust his administrative remedies against Correct Care, and on that basis, Correct Care is entitled to summary judgment in its favor. Further, having considered the record before this Court in a light most favorable to Cowher, the Court finds that the undisputed material facts in the record establish that both Correct Care and the PrimeCare defendants are entitled to summary judgment on Cowher's claim of Eighth Amendment deliberate indifference to a serious medical need, and Cowher's *Monell* claims against these Defendants. Finally, the Court declines to exercise supplemental jurisdiction over Cowher's remaining state law claims. As such, Defendants' motions for summary judgment (Doc. 71); (Doc. 75) will be granted, and judgment entered in favor of Defendants.

An appropriate Order follows.

**BY THE COURT:**

**Dated: July 18, 2019**              *s/ Karoline Mehalchick*
                                      **KAROLINE MEHALCHICK**
                                      **United States Magistrate Judge**